**Anthony L. RAY, Appellant,**

v.

**Thomas H. QUEEN, Appellee.**

**No. 98–CV–1497.**

District of Columbia Court of Appeals.

Argued Dec. 1, 1999.

Decided March 16, 2000.

Charles F. Fuller, Bowie, MD, for appellant.

Norman R. Evans, for appellee.

Before SCHWELB, REID, and WASHINGTON, Associate Judges.

SCHWELB, Associate Judge:

In this action for legal malpractice, the trial judge granted the attorney's motion for summary judgment on the grounds that the suit was barred by the three-year statute of limitations. *See* D.C.Code § 12–301(8) (1995). The client appeals, contending that the action was timely under the "discovery rule" and related equitable principles. We conclude that a genuine issue of material fact is presented as to whether, in the exercise of reasonable diligence, the client should have known or suspected at the relevant times that the attorney's conduct was wrongful. Accordingly, we reverse.

## I.

## THE FACTS

On March 29, 1989, Willie L. Ray, Sr., was killed when the car he was driving collided with a bus. Mr. Ray died intestate, leaving his widow, Bertha L. Ray, and the couple's five adult children: Willie Jr., Anthony, Karl, Lenora, and Eric. Willie Jr. was appointed personal representative of his father's estate.

Willie Jr. and his mother asked the defendant, Thomas H. Queen, Esquire, an attorney who was also a friend and neighbor of the Ray family, to represent them in connection with the accident that led to the death of the decedent. In his capacity as personal representative, Willie Jr. signed a retainer agreement engaging Mr. Queen's services to seek recovery from the bus company and its driver. Mr. Queen filed a survival action on Willie Jr.'s behalf in the United States District Court. In January 1990, the case was settled for a lump sum payment of $225,000 to Willie Jr., as personal representative, and monthly payments of $1,551.42 over a ten-year period to the decedent's widow.

In conformity with the negotiated agreement resolving the survival action, Mr. Queen received, and presented to Willie Jr., a settlement check in the amount of $225,000 payable to Willie Jr. as personal representative. Acting in conformity with Mr. Queen's instructions,[1] Willie Jr. endorsed the check and returned it to Mr. Queen, who placed it in his escrow account. Mr. Queen then disbursed the proceeds of the settlement check as follows: $5,000 to each of the Ray children,[2] and the balance, after deduction of Mr. Queen's counsel fee, to the decedent's widow. According to Willie Jr.'s deposition testimony, Mr. Queen effected this distribution of the settlement proceeds without discussing it with Willie Jr. or with the other Ray children, and without informing him or them of the provisions of D.C.Code §§ 19–303, – 306 (1997), which govern the distribution of an intestate's estate. Section 19–303 provides that "[w]hen the intestate leaves a surviving spouse and a child, or a descendant of a child, the surviving spouse is entitled to one-third."

Mr. Queen was fully aware that the distribution of the entire settlement proceeds to the decedent's widow was not in conformity with the intestacy statute. Shortly after the settlement, Mr. Queen prepared, and Mrs. Ray executed, the following "Authorization":

I, Bertha Mae Ray, the surviving widow of Willie Lee Ray, hereby acknowledge the fact that under the laws of intestacy, I realize that I am entitled to ⅓ of my deceased husband's estate and that my five (5) children, collectively, are entitled to ⅔ of my deceased husband's estate. However, in view of the fact that I was totally dependent upon my husband, I have instructed my attorney, Thomas H. Queen, Esquire, to disburse the net proceeds of the settlement in the amount of $130,601.94 as follows:

1. Each of my five (5) children is to receive a payment of $5,000 each.

2. The remaining $105,601.94 shall be paid to me directly.

I hereby agree to indemnify and save harmless my attorney, Thomas H. Queen, from any claims or suits which may be presented by any of my five (5) children, or their heirs, or anyone acting in their interest, who attempts to obtain payment of any amount that any such child shall claim to be due as the intestate portion of my deceased husband's estate.

On February 8, 1990, in a letter that accompanied the "Authorization," Mr. Queen stated that Mrs. Ray needed to sign the document "in order to make certain that I am protected from any claims that any of your children might make in the future." Willie Jr. was not apprised of this "Authorization," and his siblings were likewise unaware of it.

Mrs. Ray, who was suffering from diabetes and other ailments and unable to work, purchased a house in Mitchellville, Maryland. Willie Jr. acknowledged in his deposition that he knew that the home could only have been acquired with the proceeds of the settlement check, and that it was known to all of the Ray children that their mother had the settlement money. Although Willie Jr., as personal representative of his father's estate, was responsible for informing the court as to the estate's assets, he made no inquiry of Mr. Queen or anyone else as to the disposition of the $225,000 that the bus company had paid in settlement of the survival action. Indeed, Willie Jr. testified that he did not read the relevant documents, but simply carried out Mr. Queen's instructions. According to Willie Jr., his mother had intimated to him

---

1. Mr. Queen was not formally retained as counsel for probate proceedings arising out of the decedent's death. Willie Jr. testified, however, that he asked Mr. Queen what the responsibilities of a personal representative were, and that Mr. Queen responded: "[J]ust follow along. I will show you how to do it ."

2. The Ray children apparently treated the $5,000 check as gifts from their mother.

that all of the children would receive shares of the money after her death.[3]

Bertha Mae Ray died on March 10, 1996. In going through her effects, the Ray children discovered the "Authorization" and associated correspondence. In his deposition testimony, Willie Jr. characterized the documents as "shocking." A few days after Mrs. Ray's death, the contents of her will were disclosed to her children. It turned out that Mrs. Ray had left the house in Mitchellville and most of her other assets to her youngest son, Eric, who had been living with her and looking after her. The other children, according to Willie Jr., were "very disappointed," for they believed that their mother had deceived them by promising to set aside some of the money for them and by subsequently breaking her promise. Willie Jr. testified, however, that he and his siblings had not believed that their mother was legally obligated to leave the money to them "until we found out about the intestacy laws," an event that coincided with the discovery of the "Authorization" after Mrs. Ray's death.

On September 18, 1996, Anthony L. Ray, who had been substituted for Willie Jr. as the father's personal representative, and three of Anthony's siblings,[4] filed this suit against Mr. Queen. The plaintiffs alleged that the defendant breached his professional obligation to them, *inter alia,* by concealing his arrangement with their mother and by distributing the settlement proceeds to her when the children were entitled to receive two thirds of the proceeds under the intestacy laws. On September 20, 1997, the trial judge granted summary judgment in Mr. Queen's favor,

holding that the action was time-barred. This appeal followed.

## II.

## LEGAL DISCUSSION

A. *The summary judgment standard.*

In *Hendel v. World Plan Executive Council,* 705 A.2d 656, 660 (D.C.1997), we summarized as follows the applicable standard:

> To prevail on a motion for summary judgment, the defendants must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Super.Ct.Civ.R. 56(c); *Colbert v. Georgetown Univ.,* 641 A.2d 469 (D.C.1994) (en banc). The evidence must be viewed in the light most favorable to [the plaintiff], and she is entitled to "all favorable inferences which may reasonably be drawn from the evidentiary materials." *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 198 (D.C.1991).
>
> "On appeal from an award of summary judgment, this court conducts an independent review of the record, but the substantive standard is the same as that utilized by the trial court." *Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C. 1994) (citation omitted). The test for deciding a motion for summary judgment is essentially the same as the standard for a directed verdict. *Beard, supra,* 587 A.2d at 199. In considering the motion, the judge must determine "whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented."

---

**3.** Willie Jr. did indicate that he became suspicious of his mother's responses to his questions about the settlement. He stated that "I asked. I asked, that was all I did was ask and I didn't receive .... All I know is that she did not answer the questions that I asked her." In spite of his mother's lack or responsiveness, however, Willie Jr. knew (and acknowledged in his deposition testimony that he knew) that the settlement proceeds had been distributed to her.

**4.** All of the Ray children except Eric joined the suit as plaintiffs. The trial judge dismissed the action against all of the plaintiffs except the personal representative, concluding that Mr. Queen was not those plaintiffs' attorney. The dismissed plaintiffs have not pressed their appeal.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. *Substantive legal principles.*

■ An action for legal malpractice must be filed no later than three years after the right to maintain the action accrues. D.C.Code § 12–301(8). Mr. Queen's alleged malpractice occurred in 1990, more than three years before this suit was brought.[5] The personal representative claims, however, that the Ray children did not learn of the malpractice until after their mother's death in 1996, and that institution of the suit was therefore timely under the "discovery rule." In a related contention, the personal representative also argues that Mr. Queen, a person who allegedly owed him a fiduciary duty, wrongfully concealed from the children a critical fact, namely, that the distribution to Mrs. Ray of virtually the entire settlement proceeds was unlawful. According to the personal representative, such concealment was in violation of Mr. Queen's obligations as a fiduciary and tolled the running of the statute of limitations.

5. Under our "continuous representation" rule, the statute of limitations did not begin to run until Mr. Queen's representation of the Plaintiff in the survival action had terminated. *See RDH Communications, Ltd. v. Winston*, 700 A.2d 766 (D.C.1997). In this case, Mr. Queen claims that the representation ended in 1990 with the settlement of the survival action and the distribution of the settlement proceeds.

The evidence shows that Mr. Queen was still involved in the family's legal matters at the time of Mrs. Ray's death in 1996. In fact, it was he who read Mrs. Ray's will to her children. The personal representative has not invoked the "continuous representation" doctrine, however, and we do not address it.

6. In cases involving alleged misrepresentation or concealment, there is an obvious overlap between the discovery rule and the tolling doctrine. Courts differ in their formulation of the relevant principles, but the key issue is whether under all the circumstances, including the nature of the relationship between the parties, as well as any evidence of deceptive conduct by the defendant the plaintiff was on "inquiry notice" at the relevant time. See *infra* p. 1141.

## (1) *The discovery rule.*

■ Under the discovery rule, a plaintiff's right of action in a legal malpractice case does not accrue until the plaintiff has knowledge of, or by the exercise of reasonable diligence should have knowledge of (1) the existence of the injury; (2) its cause in fact; and (3) some evidence of wrongdoing. *See Diamond v. Davis*, 680 A.2d 364, 371 (D.C.1996) (per curiam) (citing, *inter alia, Knight v.. Furlow*, 553 A.2d 1232, 1234 (D.C.1989), and *Bussineau v. President and Dir.'s of Georgetown College*, 518 A.2d 423, 425 (D.C.1986) (medical malpractice)). In order for the statute of limitations to begin to run, it is only necessary that the plaintiff have inquiry notice of the existence of a cause of action. *See Colbert v. Georgetown Univ.*, 641 A.2d 469, 473 (D.C.1994) (en banc). Inquiry notice is the applicable standard even where, as here, there are allegations of wrongful concealment or nondisclosure on the part of an attorney in a legal malpractice case. *See Diamond, supra*, 680 A.2d at 381.[6] The critical ques-

Our dissenting colleague believes that our analysis is contrary to this court's holding in *Diamond* the inquiry notice standard applies even where fraudulent concealment has been alleged. We do not agree. Applied to the present record. *Diamond* stands for the proposition, with which we agree, that the existence of a fiduciary relationship between Mr. Queen and the Ray children does not alter the rule that the limitations period began to run as soon as the Rays were on inquiry notice. The nature of the relationship, however, is highly relevant to whether inquiry notice existed, *i.e.*, whether reasonable diligence required the Rays to suspect wrongdoing on Mr. Queen's part. As noted in the text, *infra*, p. 1142, we recognized in *Diamond* that "[i]n evaluating the reasonableness of the plaintiff's diligence, cases from this jurisdiction have long taken into account the confidential or fiducial relationship between the plaintiff and the defendant." 680 A.2d at 376 (citations omitted); *see also id.* at 377 ("That a defendant's actions [may have] obscured the relevant facts from a plaintiff is … appropriately taken into account as part of the circumstances to be considered in examining the reasonableness of the plaintiff's diligence.").

tion in assessing the existence *vel non* of inquiry notice is whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him. *Id.* at 376–81.[7]

■■ "In all cases to which the discovery rule applies[,] the inquiry is highly fact-bound and requires an evaluation of all of the plaintiff's circumstances." *Id.* at 372. In determining whether the plaintiff exercised reasonable diligence, the court should consider, *inter alia*, whether there was a fiduciary relationship between the parties. *Id.* at 365. Indeed, cases from this jurisdiction, as well as those decided by other courts, "have long taken into account the confidential or fiducial relationship between the plaintiff and defendant." *Id.* at 376 ("although, reposing confidence in their agents, [the complainants] may have neglected availing themselves of some source of knowledge . . . , the defendants cannot be allowed to say that complainants ought to have suspected them, and are chargeable with what they might have found out upon inquiry aroused by such suspicion") (quoting *Kilbourn v. Sunderland*, 130 U.S. 505, 519, 9 S.Ct. 594, 32 L.Ed. 1005 (1889) (alteration in original)); *see also Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex.1988) ("The client must feel free to rely on his attorney's advice. Facts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved."); *Hobbs v. Eichler*, 164 Cal. App.3d 174, 210 Cal.Rptr. 387, 404 (1985) ("Where a fiduciary relationship exists, facts which ordinarily require investigation may not incite suspicion . . . and do not give rise to a duty of inquiry. . . .") (citations omitted). In *Merchants Mortgage Co. v. Lubow*, 275 Md. 208, 339 A.2d 664 (1975), the court summarized the applicable principles:

The rule that, in cases of fraud, the statute of limitations begins to run only from the time of the discovery of the fraud, will not apply where the party affected by the fraud might, with ordinary diligence, have discovered it. But the failure to use such diligence may be excused where there exists some relation of trust and confidence . . . between the party committing the fraud and the party who is affected by it, rendering it the duty of the former to disclose to the latter the true state of the transaction, and where it appears that it was through confidence in the acts of the party who committed the fraud that the other was prevented from discovering it.

*Id.* at 669 (quoting *Perkins v. First Nat'l Bank of Atlanta*, 221 Ga. 82, 143 S.E.2d 474, 484 (1965)).

*(2) Tolling.*

Closely related to the discovery rule is the doctrine of tolling, which is frequently applied where the conduct of a fiduciary is alleged to have lulled the plaintiff into failure to protect his interests within the statutory limitations period. *See, e.g., Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 995 (D.C.1978). This doctrine reflects a broader legal principle; as Justice Black, writing for the Court, explained in *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232–33, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959),

no man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has been applied in many diverse classes of cases by both law and equity courts and has frequently been employed to bar inequitable reliance on statutes of limitations.

*Accord, Diamond, supra*, 680 A.2d at 376 ("[i]n evaluating the plaintiff's diligence, we have also taken into account deceptive actions on the part of the defendant, re-

---

**7.** *Cf. East v. Graphic Arts Indus. Joint Pension Trust*, 718 A.2d 153, 157 (D.C.1998) ("the focus of the [discovery] rule is on when [the plaintiff] gained the *general* knowledge that her firing by her employer was wrongful, not on when she learned of the *precise* legal remedies for the firing") (emphasis in original).

gardless of disclosures actually made"); *Farris v. Compton,* 652 A.2d 49, 55 (D.C. 1994) ("[r]efusal to protect a plaintiff from the running of the statute of limitations may be especially unfair where, as alleged in this case, her lack of knowledge of her injuries was proximately caused by the defendant's own wrongful conduct").

Although, in some cases, the concealment or nondisclosure warranting the tolling of the statute has related to purely factual matters, the doctrine has also been applied to misrepresentations of law. According to the plaintiff's allegations in *Glus,* the defendant had represented to the plaintiff that the plaintiff had seven years to bring a suit against the defendant, when in fact the statute of limitations required the action to be filed in three years. The Supreme Court held that if the plaintiff were to succeed in proving that the defendant's agents made such a representation and that the plaintiff relied on it, then the defendant would be estopped from invoking the three-year statute. The Court firmly rejected any suggested distinction, at the pleading stage, between representations of fact and representations of law:

> It is no answer to say, as respondent does, that the representations alleged were of law and not of fact and therefore could not justifiably be relied on by petitioner. Whether they could or could not depends on who made them and the circumstances in which they were made. *See Scarborough v. Atlantic Coast Line R. Co.,* 190 F.2d 935 [ (4th Cir.1951) ]. Such questions cannot be decided at this stage of the proceedings.

359 U.S. at 235, 79 S.Ct. 760.

In *Glus,* there was no allegation that the representation of law on which the plaintiff relied to his detriment was made by a lawyer. But in the *Scarborough* case—the very authority cited by the Supreme Court in *Glus* in the passage quoted above—the court emphasized that an incorrect representation of law by an attorney to a layman provides an even more compelling basis for tolling the statute of limitations:

> Lawyers are, or should be, regarded as possessed of knowledge and integrity beyond that of most of their fellows, certainly above the level of the market place. We find nothing unreasonable or imprudent in the reliance of the plaintiff upon the words of this attorney who had won the plaintiff's confidence through his friendly overtures and through his membership in an honorable profession.

> \*   \*   \*   \*   \*   \*

> The rule is also well established that when a lawyer makes a representation of law to a layman relief may be afforded, even though the layman knows the lawyer represents an antagonistic interest. Any other rule would be unconscionable.

190 F.2d at 939–40 (citations and internal quotation marks omitted); *see also RDH Communications, supra* note 5, 700 A.2d at 769 ("Often, a client looks to his attorney for advice in areas in which he knows little or nothing. This is a relationship of trust[,] and we see no compelling reason for informing the client that he can no longer trust the professional from whom he seeks guidance....").

■ Finally, a representation need not be effected by words in order to implicate the tolling doctrine. Indeed, actions may often speak louder than words. The Court stated in *Glus:*

> The principle is that where one party has by his representations *or his conduct* induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage.

359 U.S. at 234, 79 S.Ct. 760 (emphasis added) (quoting *Insurance Company v. Wilkinson,* 80 U.S. (13 Wall.) 222, 233, 20 L.Ed. 617 (1871)).

C. *Analysis.*

■ Applying the foregoing principles to the case before us, we conclude that Mr.

Queen is not entitled to summary judgment. To be sure, there is some evidence in the record to support the conclusion that the personal representative was on inquiry notice in 1990 of wrongdoing by the defendant. We cannot say, however, that the record as a whole, viewed as it must be in the light most favorable to the personal representative, compels that conclusion. Mr. Queen has not demonstrated the absence of a genuine issue of material fact, nor has he shown that he is entitled to judgment as a matter of law.

It is on the "knowledge of some wrongdoing" element of the discovery rule, see Bussineau, supra, 518 A.2d at 425, that the defendant's position falters, for the other elements have been satisfied. The injury complained of in this case is the distribution of all of the settlement proceeds to Mrs. Ray, and Willie Jr. acknowledged that, notwithstanding his mother's evasiveness, he was aware, at all times here relevant, that she had the money. Willie Jr. also knew the "cause in fact" of the injury, for having handed over the endorsed settlement check to Mr. Queen, he necessarily knew that it was the latter who effected the distribution. The personal representative insists, however, that the Ray children did not know until after their mother's death in 1996 that their mother was not entitled to the money, for it was only then that they learned of the provisions of the intestacy statute.

Willie Jr. was the original personal representative of his late father's estate, and it would certainly have been prudent of him to acquaint himself with the basic principles of the law of intestacy. Willie Jr. testified, however, that he relied entirely on Mr. Queen's advice. Although Mr. Queen was not formally retained by Willie Jr. for the probate proceeding, there is ample record evidence to permit a reasonable trier of fact to conclude that Mr. Queen owed the personal representative a fiduciary duty with respect to the distribution of the settlement proceeds. Those proceeds, after all, consisted of the money obtained in a survival action in which Mr. Queen did represent Willie Jr. In addition, Willie Jr. testified that he asked Mr. Queen for advice as to the duties of a personal representative, and that Mr. Queen agreed to tell Willie Jr. what to do. Finally, Mr. Queen can hardly claim that he was not involved in the disposition of the decedent's estate when he personally distributed of the estate's principal asset— the settlement proceeds—in a manner contrary to the provisions of the intestacy law.

The existence rel non of a fiduciary relationship between the plaintiff and the defendant is a significant element in the "inquiry notice" calculus. See Part II B(1), supra. If Willie Jr. had not been relying on Mr. Queen for legal advice, then his passivity while the money was being distributed to his mother, as well as his failure to read the relevant documents, might arguably have established, as a matter of law, that he was not acting with reasonable diligence. But given the evidence of a fiduciary relationship and Willie Jr.'s reliance on Mr. Queen's advice, we conclude, in light of the authorities cited at pp. 1141–42, that a genuine issue of material fact is raised as to whether the plaintiff knew or should have known of possible wrongdoing.

We are also of the opinion that the result must be the same if the case is analyzed under the related rubric of "tolling." Mr. Queen is an attorney; Willie Jr. is a layman. Willie Jr. therefore had the right to assume that Mr. Queen knew the law and would carry out his responsibilities in accordance with the law. Under these circumstances, Willie Jr. was entitled to rely on Mr. Queen's representations, whether explicit or implicit. If Mr. Queen's conduct had the effect of concealing, from Willie Jr. and his siblings, the fact that the distribution of all of the settlement proceeds to Mrs. Ray was contrary to the law of intestacy, then the tolling principles of Glus necessarily apply.

To be sure, there is no allegation that Mr. Queen made any false oral or written

representation to Willie Jr. regarding the proper distribution of an intestate's assets. Indeed, Willie Jr. acknowledged that he did not ask Mr. Queen any questions about the law of intestacy. As the Court explained in *Glus*, however, a representation implicating the tolling doctrine can be effected by conduct as well as by words. Here, Mr. Queen asked Willie Jr. to endorse the settlement check, and he then had the proceeds, except for the $5,000 "gifts," distributed to Mrs. Ray. When an attorney distributes a decedent's entire estate to the widow, he at least arguably represents to the decedent's children that the widow is legally entitled to receive the money. At the very least, an impartial trier of fact could reasonably so find.

Moreover, Mr. Queen knew that the payment of the settlement money to the widow was contrary to law, and he caused Mrs. Ray to sign an "Authorization" effectively acknowledging the illegality of the arrangement. Indeed, the "Authorization," written by Mr. Queen, states that Mrs. Ray's five children "collectively, are entitled to ⅖ of my deceased husband's estate." Mr. Queen did not, however, advise the personal representative, to whom he owed a fiduciary duty,[8] of the secret arrangement that he had made with Mrs. Ray to circumvent the children's entitlement. The nondisclosure to the Ray children of the "Authorization,"[9] and of the provision of the intestacy statute which that "Authorization" referred, reinforces our conclusion that genuine issues of material fact are presented and that summary judgment is inappropriate.

Mr. Queen takes the position that the family wanted the money distributed to Mrs. Ray, that he merely carried out the plan favored by the family,[10] that he gained no profit from the arrangement, and that he therefore did no wrong. We agree with Mr. Queen's position in part; there is, indeed, no evidence that his actions in this matter were motivated by any desire for personal gain. But the "Authorization" itself strongly implies that the Ray children had not consented to the plan, and that they might sue him, as well as Mrs. Ray, if they learned of it. That, indeed, was Mr. Queen's reason for requiring Mrs. Ray to agree to hold him harmless. On the record before us, we are in no position to affirm summary judgment in Mr. Queen's favor on the theory that he had simply done what all concerned had asked him to do. That defense, if sustainable at all, must be presented at trial.

It may well be that, after the evidence is in, a statute of limitations defense will prevail. The jury may decide that Willie Jr. was on inquiry notice of some wrongdoing on the part of Mr. Queen, and that he did not act with reasonable diligence on the information available to him.[11] The

8. To put it more precisely, an impartial trier-of-fact could reasonably find that Mr. Queen owed Willie Jr. a fiduciary duty.

9. We cannot agree with our dissenting colleague's apparent view, *post* at 1147–48, that Willie Jr.'s obligation to exercise reasonable diligence required him to search his mother's files and discover the "Authorization."

10. Willie Jr. was asked during his deposition whether he and his siblings would have objected to the distribution of the settlement proceeds to their mother if they had known of the provisions of the intestacy law. His response was:

[I]t is kind of hard to reflect on what we would have done in hindsight. I don't know. I don't know. If I had had that knowledge, if I had had the opportunity to sit down and the situation was presented, I don't know. I might have agreed. Some might not.

At trial, Willie Jr.'s uncertain response to this question might tend to show that Mr. Queen's conduct was not the cause of the children's acquiescence in the arrangement that their mother would receive not only a monthly payment, but also all of the other settlement money. Summary judgment cannot, however, properly be imposed on the basis of any inference from this testimony.

11. Our dissenting colleague refers in the first paragraph of her opinion to "the majority's apparent conclusion that Mr. Ray was not on inquiry notice until 1996." We reach no such conclusion, and we agree with Judge Reid that there is significant evidence that Willie

jury might also conclude that under all of the circumstances, the personal representative had no right to treat Mr. Queen's distribution of the settlement proceeds as a representation by conduct regarding the applicable law. We hold only that, under all of the circumstances, summary judgment was not warranted.

## III.

## CONCLUSION

For the foregoing reasons, the judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

REID, Associate Judge, dissenting.

I respectfully disagree with the majority's conclusion that "a genuine issue of material fact is presented as to whether, in the exercise of reasonable diligence, [Willie Ray, Jr.] should have known or suspected at the relevant times that [attorney Thomas H. Queen's] conduct was wrongful." The record in this matter is clearly at odds with the majority's apparent conclusion that Mr. Ray was not on inquiry notice [1] until 1996 when he saw a February 1990 document signed by his mother, because he did not learn until 1996, that his mother was not entitled to the proceeds from a civil action settlement due to laws of intestacy.

I fully agree with the trial judge that when Mr. Ray signed the settlement check in the amount of $225,000 in January 1990, and received only $5,000 in February 1990,

"that put him on notice to start wondering and start investigating." As the trial judge stated:

> [Mr. Ray] knew back on February 9, 1990, or at least by February 10, 1990 that 200 and some thousand [dollars] should have come to [him] and should not have been paid out to anybody else. [He] was the one that was the personal representative of the estate prosecuting this wrongful death and survival act. So he should have done something before this statute r[a]n.

First, inescapable for me is the trial judge's conclusion that Mr. Ray had imputed knowledge when, as personal representative for the civil action that resulted in the settlement, he only received $5,000 out of $225,000. Second, the majority appears to do what I understand was rejected in our decision in *Diamond, supra* note 1,—that is, carve out a more stringent standard, akin to actual knowledge, for cases involving possible breach of fiduciary duty or fraud.

First, Mr. Ray's own deposition testimony reveals that he had imputed knowledge, and was on inquiry notice in 1990 regarding the distribution of the proceeds from the civil action settlement. In essence, Mr. Ray argues that his mother and Mr. Queen deceived him as to how the settlement funds from the civil action involving his father's death would be distributed; Mr. Queen did not explain the intestacy laws to him; and he had no notice of wrongdoing until he discovered a document in 1996 that his mother had executed in February 1990.

Jr. should have suspected that something was amiss. We hold only that a jury question is presented as to whether, when the record is viewed in the light most favorable to the plaintiff, Willie Jr. was on notice that Mr. Queen's conduct was wrongful.

1. In *Cevenini v. Archbishop of Washington,* 707 A.2d 768, 771 (D.C.1998), we again stated that "'inquiry notice' is that notice which a plaintiff would have possessed after due investigation." 707 A.2d at 771 (quoting *Diamond*

*v. Davis,* 680 A.2d 364, 372 (D.C.1996)). We also said:

> In the District of Columbia, a plaintiff can be charged with inquiry notice of his claims even if he is not actually aware of each essential element of his cause of action. This court has repeatedly held that a claim accrues when the plaintiff knows of (1) an injury, (2) its cause, and (3) some evidence of wrongdoing.

*Id.* (citing *Diamond, supra,* 680 A.2d at 379–80 (other citations omitted)).

Mr. Ray's deposition testimony shows that his mother was a long-term diabetic, had suffered from congestive heart failure and had become an invalid. He was advised by doctors at Walter Reed Army Medical Center that "long-term diabetes can do things. You can't think very clearly." After Mr. Ray signed the 1989 retainer agreement for the civil action with Mr. Queen, he knew that "correspondence was basically between [his] mother and [Mr.] Queen," and that his mother "shared very little with [me]." Furthermore, he complained in his deposition that his mother "confided mostly in one person. That was Eric [Mr. Ray's younger brother]. She felt closer to him." He stated that at the time of the settlement, "I asked, I asked, and that was all I did was ask [his mother about the settlement] and I didn't receive . . . . She told me what she wanted to tell me." He acknowledged that he signed the settlement check, saw it was for $225,000 and received only $5,000. In addition, he admitted that he knew his mother was getting over fifteen hundred dollars a month from the settlement proceeds, beginning in 1990. As he stated: "I have seen [the payments]. I have [gone] to the mailbox and got them out for her and whatnot." Mr. Ray was aware that, after his father's death, his mother and his brother Eric bought a home in Mitchellville, Maryland at a cost of about $250,000, without selling the family home in the District of Columbia. Despite all of these warning signs, he did not ask Mr. Queen how the settlement funds should be distributed. He did not pose any questions to his brother Eric. Nor did he write to anyone to inquire about the distribution of the settlement funds. In fact, Mr. Ray stated:

> I think what you fail to realize here is that, the family was glad to see [my mother] with another place [the Mitchellville house]. Okay? And the issue of— we knew that she had some money, we believed her when she said that she was going to set some money aside. We did not question the amount. It could have

[been] $5.00, we don't know. All we know is what she said. Now when she went and bought the house, instead— This is our mother we are talking about. We are not really concerned. We are glad. So we really didn't think like that. See, you are talking about my mother. We just wasn't thinking that way.

Despite these statements, Mr. Ray indicated that he and his siblings (other than Eric) were "disappointed" when they heard the reading of their mother's will and discovered that his mother had left both the Maryland and the District of Columbia houses, as well as a bank account, to Eric. They thought the assets would be divided among all the children. Furthermore, he claims that he relied on the advice of Mr. Queen. Yet, at no time prior to his mother's death did he seek to learn the contents of her will, either from his mother or Mr. Queen. During his deposition, he was asked: "Were there any discussions with your mother, Mrs. Ray, in reference to where the other money went to?" He responded: "Nope." He was also asked: "After you cashed the check for $5,000, did you have any occasion to have any further discussion with Mr. Queen?" He replied: "No, I didn't." In addition, the document about which he expressed "shock" was not located in a concealed place. Rather, it was in a small, two-drawer file cabinet that was in the "dining area" of the house. With reasonable diligence, Mr. Ray could have discovered the document at a much earlier point in time than 1996, or sought information as to whether the settlement funds should have been distributed in a different manner.

In 1990, Mr. Ray was an adult, married and had his own family. He was gainfully employed and a person of at least ordinary intelligence. In *Diamond, supra* note 1, we said:

> In every case, the plaintiff has a duty to investigate matters affecting [his] affairs with reasonable diligence under all the circumstances. Once the plaintiff actually knows, or with the exercise of rea-

sonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing, then [he] is bound to file [his] cause of action within the applicable limitations period, measured from the date of [his] acquisition of the actual or imputed knowledge.

680 A.2d at 381. The record shows that Mr. Ray had imputed knowledge of possible wrongdoing in February 1990 when, as personal representative for the civil action in behalf of his father's estate, he did not receive all of the settlement proceeds. Despite the warning signs of his mother's evasiveness and unwillingness to discuss the matter, his knowledge that she was receiving monthly payments from the settlement proceeds, and her purchase of a Maryland home with his brother Eric, he failed to engage in reasonable diligence to determine why he did not receive the settlement funds, or whether his mother was entitled to so much of the proceeds. He did not even take the easy step of posing questions to Mr. Queen about how the funds were or should be distributed. Under the circumstances, there were sufficient warning signs to prompt a reasonable person to investigate.

Second, the majority appears to apply a standard stricter than that required in *Diamond, supra* note 1. There, we emphasized that "a focus on the plaintiff's diligence, rather than on the defendant's misconduct, is more appropriate given the purpose of statutes of limitation to protect defendants from stale claims—whether they be for fraud or other breaches of duty." *Id.* at 378. Indeed, we rejected the invitation "to articulate a standard greater than negligence as part of the discovery rule that applies in actions where the cause of action has been concealed from the plaintiff by some wrongful conduct," or a standard that "demand[s] less than reasonable care from the plaintiff where the plaintiff has been the victim of fraud." *Id.* at 376. In my view, the majority concludes that, (1) despite the fact that Mr. Queen represented

none of the children except Mr. Ray in the civil action, (2) even though he did not represent Mr. Ray in the probate proceeding, and (3) although "there is no allegation that Mr. Queen made any false oral or written representation to [Mr. Ray], regarding the proper distribution of an intestate's assets," nonetheless, "a genuine issue of material fact is raised as to whether [Mr. Ray] acted with reasonable diligence, and therefore as to the existence of inquiry notice." This conclusion not only appears to relieve Mr. Ray of any obligation to engage in the reasonable diligence required by *Diamond, supra* note 1, simply because he stated that he relied on Mr. Queen's advice and he was in a fiduciary relationship with Mr. Queen as to the civil action, but also makes meaningless the concept of "imputed knowledge." In short, I believe that the majority has imposed a stricter standard than that required by *Diamond, supra* note 1, and is, in fact, mandating a standard akin to actual knowledge.

For these reasons, I respectfully dissent.

