*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CV-1176

BDO SEIDMAN, LLP, APPELLANT,

v.

MORGAN, LEWIS & BOCKIUS LLP, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CA-9640-09)

(Hon. A. Franklin Burgess, Jr. and Hon. Brook Hedge, Motions Judges)

(Argued September 26, 2013                    Decided April 24, 2014)

*Benjamin S. Boyd*, with whom *Lucinda J. Bach*, *Charles B. Wayne*, and *Michelle L. Schaefer* were on the brief, for appellant.

*James P. Fogelman*, with whom *Natalie O. Ludaway* was on the brief, for appellee.

Before FISHER and MCLEESE, *Associate Judges,* and PRYOR, *Senior Judge.*

MCLEESE, *Associate Judge*: Appellant BDO Seidman, LLP ("BDO") provides tax and financial advice. In 1999, BDO turned its Tax Solutions Group ("TSG"), which promoted "tax products," into a separate limited-liability corporation. Three BDO partners who were also members of TSG retained

appellee Morgan, Lewis & Bockius LLP ("MLB") to represent them personally in negotiating compensation and indemnification agreements in connection with the transaction. MLB also represented BDO on various matters, including matters related to TSG products. The government subsequently concluded that some TSG products were unlawful, and several BDO partners were convicted of crimes in connection with TSG's activities. BDO clients sued BDO in connection with TSG products, and BDO settled that suit for over $21 million in 2005. In 2009, BDO sued MLB, alleging legal malpractice, breach of fiduciary duty, and fraud. The trial court granted summary judgment to MLB on the ground that BDO's suit was barred by the statute of limitations. BDO seeks review of that ruling. We affirm.

**I.**

The following facts are either alleged by BDO or not disputed by BDO. In 1999, BDO created a limited-liability corporation called TSG, owned by BDO but exclusively managed by three BDO senior partners (collectively, the "Individuals"). The Individuals repeatedly assured others at BDO that TSG's activities were "strictly legitimate" and would "more likely than not" be upheld if challenged by the Internal Revenue Service.

The Individuals retained MLB to represent them personally in negotiating with BDO the terms of their compensation and indemnification agreements in connection with the creation of TSG. MLB was already representing BDO on a matter, but BDO signed an agreement waiving any conflict of interest arising from BDO's representation of the Individuals.

Despite their assurances to others at BDO, the Individuals became concerned about the risks of potential criminal and civil liability to themselves and BDO arising from TSG's activities. In February 2000, without informing others at BDO, the Individuals hired MLB -- on behalf of BDO -- to analyze those potential risks. MLB sent BDO an engagement letter in March 2000 that included a general conflict waiver. The engagement letter did not refer to an analysis of the risks posed by TSG's activities. BDO signed the waiver.

While working on the risk-analysis project, MLB identified several risks associated with TSG products, including investigation by the IRS, class-action lawsuits by disappointed clients, personal civil and criminal liability for the Individuals, and possible conflicts of interests between BDO and the Individuals. MLB disclosed those risks only to the Individuals. The Individuals and MLB took steps to prevent others at BDO from discovering the risks, including by arranging

that the bills associated with MLB's risk assessment be paid without the usual review and oversight by BDO's legal department.

In June 2000, BDO approved compensation agreements for the Individuals, which provided among other things that BDO would indemnify the Individuals for all liabilities incurred on behalf of BDO for TSG activities. Soon thereafter, MLB prepared a supplemental engagement letter indicating that BDO had engaged MLB to prepare a written memorandum about whether TSG's tax products would be subject to criminal penalties. The parties dispute whether anyone at BDO other than the Individuals saw that engagement letter. When two of the MLB attorneys working on the risk analysis moved to the law firm of Hogan & Hartson, LLP, they continued working on the memorandum. MLB also continued to work on the matter.

In August 2000, the IRS issued a notice indicating that transactions arguably similar to one marketed by TSG were subject to reporting requirements and that persons marketing them might be subject to civil and criminal penalties. The Individuals were concerned that the notice raised the possibility of criminal liability. An MLB partner also had that concern. MLB did not express that concern in the final version of the written memorandum, which was not seen by

anyone at BDO other than the Individuals until February 2002. The written memorandum did not rule out the possibility of criminal prosecution but concluded that any prosecution of BDO would be "insurmountably difficult" with "an extremely low chance of success on the merits." The written memorandum was not delivered to BDO, but rather was kept at MLB's offices. Drafts of the memorandum were circulated to two people at BDO other than the Individuals.

In December 2000, the IRS sent BDO a letter stating that the IRS believed that BDO had promoted abusive tax shelters and asking BDO to identify its clients. The Individuals retained the law firm of White & Case to represent BDO in connection with the response to the IRS letter. The general counsel of BDO did not learn of the letter until months later. BDO responded to the IRS by indicating that it did not believe that TSG's activities were substantially similar to those addressed in the IRS notice.

In the spring of 2002, the IRS served summonses on BDO, seeking production of documents with respect to TSG's activities. The law firms of White & Case and Jenner & Block initially represented BDO in connection with the summonses, but MLB began representing BDO on the matter in the fall of 2002. MLB and the Individuals failed to disclose the written memorandum prepared by

attorneys from Hogan & Hartson and MLB, even though the written memorandum was responsive to the summonses. The Individuals led other BDO partners to believe that BDO was appropriately attempting to resist the summonses. Despite being asked to brief the question whether the crime-fraud exception might vitiate any privilege between BDO and its clients with respect to TSG's activities, MLB did not disclose to BDO either the written memorandum or the Individuals' and MLB's concerns about potential criminal liability.

In July 2002, the American Association of Certified Public Accountants sent BDO a letter suggesting that it might undertake an investigation into BDO's activities. In March 2003, BDO was the subject of a congressional investigation, and MLB represented BDO on that matter.

In July 2003, former TSG clients filed a class-action suit against BDO and other defendants relating to TSG's activities. MLB did not represent BDO in the class action.

In late 2003, MLB represented BDO in negotiating resignation agreements with two of the Individuals and a continuing-employment agreement with the third Individual. The Individuals retained the law firm of Holland & Knight to represent

them in connection with the 2003 agreements, which included broad indemnification clauses and released the Individuals from all known and unknown claims. MLB did not disclose to anyone at BDO other than the Individuals the risks posed to BDO by TSG's activities.

In 2004, BDO conducted an internal investigation of one of the Individuals, during which BDO discovered that the IRS viewed BDO as "non-compliant." BDO decided to cooperate with the IRS and rescinded the 2003 Agreements.

In November 2005, BDO settled the class action brought by its former clients relating to TSG's activities for over $21 million.

In 2007, a partner at BDO contacted MLB about whether MLB could represent that partner on a matter. After MLB declined because of a conflict of interest with BDO, BDO requested MLB's files on BDO matters. After reviewing the files, BDO realized that MLB had provided advice to BDO about the risks of civil and criminal liability associated with TSG's activities.

On December 30, 2008, BDO and MLB executed an agreement tolling the statute of limitations for one year. On December 30, 2009, BDO filed a complaint

against MLB, alleging, among other things, legal malpractice, breach of fiduciary duty, fraud, and constructive fraud. Specifically, BDO alleged that MLB committed malpractice by (1) representing BDO while in a conflict of interest arising out of MLB's simultaneous representation of the Individuals; (2) providing negligent advice regarding potential risks associated with TSG's activities; and (3) failing to disclose those risks to BDO partners other than the Individuals.

MLB moved for summary judgment on statute-of-limitations grounds, and the trial court granted that motion. The trial court first concluded that the knowledge of BDO partners, including the Individuals, should be imputed to BDO. The trial court further noted that, even if the Individuals' knowledge could not be imputed to BDO, the remaining partners' knowledge could still be imputed. The trial court finally concluded that BDO's knowledge -- whether gained through the Individuals or solely through the other partners -- was sufficient to put BDO on inquiry notice of its causes of action well before December 30, 2005, and that BDO was therefore barred by the three-year statute of limitations from raising its claims.

## II.

We review de novo orders granting summary judgment. *Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011). "[W]e independently analyze the record in the light most favorable to the non-moving party, drawing all reasonable inferences from the evidence in the non-moving party's favor." *Id.* We will uphold the grant of summary judgment if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (internal quotation marks omitted).

BDO raises two principal challenges to the trial court's summary-judgment ruling. First, BDO contends that the trial court erred by imputing the knowledge of BDO's partners to BDO. Second, BDO contends that the trial court erred in concluding as a matter of law that BDO was on inquiry notice of its causes of action against MLB before December 30, 2005.[1] We do not agree with BDO's contentions.

---

[1] BDO argued in the trial court that the statute of limitations was tolled until at least December 30, 2005, because MLB continued to represent BDO with respect to the 2003 agreements through that date. *See generally R.D.H. Commc'ns, Ltd. v. Winston*, 700 A.2d 766, 768 (D.C. 1997) (cause of action in legal malpractice claims "does not accrue until the attorney's representation concerning the particular matter at issue is terminated") (internal quotation marks omitted).

(continued…)

**A.**

We agree with the trial court that the knowledge of BDO partners other than the Individuals is properly imputed to BDO.[2] Under District of Columbia law, imputation of knowledge with respect to partnerships is governed by D.C. Code § 29-601.03 (f) (2012 Repl.), which provides:

> A partner's knowledge, notice, or receipt of a notification of a fact relating to the partnership shall be effective immediately as knowledge by[,] notice to, or receipt of a notification by, the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

*Cf. also BCCI Holdings (Luxembourg), S.A. v. Clifford*, 964 F. Supp. 468, 478

---

(…continued)
The trial court rejected that argument, concluding that MLB was not representing BDO with respect to the matter at issue in this case beyond February 2002. BDO does not brief this argument on appeal and we therefore do not address the argument. *See Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993) ("It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived.").

[2] The trial court also imputed to BDO the knowledge of the Individuals, on the theory that any fraud by the Individuals "was against the government and TSG's tax clients, not against BDO." Because we uphold the trial court's ruling that BDO was on inquiry notice based solely on the knowledge of BDO partners other than the Individuals, we do not address whether the trial court properly imputed knowledge of the Individuals to BDO.

(D.D.C. 1997) ("As a general rule, knowledge acquired by a corporation's officers or agents is properly attributable to the corporation itself.").[3]

Because BDO does not contend that any of BDO's partners other than the Individuals were involved in fraud on the partnership, § 29-601.03 (f) by its terms seems to require imputation.[4] BDO argues, however, that there is an implicit "wrongdoer" exception to § 29-601.03 (f). We conclude that any such exception would not extend to the circumstances of this case.

BDO argues that only an "innocent third party" can rely on the principle that the knowledge of partners is ordinarily imputed to the partnership. We disagree. Neither this court nor any other of which we are aware has adopted so sweeping a rule. To the contrary, courts have upheld decisions imputing knowledge to

[3] BDO asserts in a footnote that the trial court should have applied New York partnership law rather than District of Columbia partnership law, because BDO is a New York limited partnership. Because BDO presents no argument in support of this assertion, the issue is not properly before this court. *See Bardoff v. United States*, 628 A.2d 86, 90 n.8 (D.C. 1993) (issues raised in brief but not supported by argument are considered abandoned).

[4] BDO's general counsel was not a partner, but the trial court attributed the general counsel's knowledge to BDO under common-law agency principles. *See, e.g.*, *Capital View Realty Co. v. Meigs*, 92 A.2d 765, 766 (D.C. 1952) ("A principal is charged with the knowledge of the agent acquired by the agent in the course of the principal's business.") (internal quotation marks omitted). BDO does not raise a separate challenge to that ruling.

partnerships in connection with suits in which the partnership alleged wrongdoing by the defendant. *See, e.g.*, *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 650 F. Supp. 1378, 1386 (W.D. Va. 1986) (under Virginia law, knowledge of two general partners was imputable to partnership in action brought by partnership claiming that defendants had defrauded partnership), *aff'd*, 840 F.2d 236 (4th Cir. 1988); *cf. McNeil Pac. Investors Fund 72, Ltd. v. Ernst & Young*, No. 05-94-01527-CV, 1995 WL 447557, at *8 (Tex. App. July 28, 1995) (in concluding that partnerships' fraud claims were barred by statute of limitations, trial court imputed partner's actual notice of fraud to partnerships); *Bedolla v. Logan & Frazer*, 125 Cal. Rptr. 59, 64-67 (Ct. App. 1975) (in finding that limited partnership's fraud and professional-negligence claims were barred by statute of limitations, trial court imputed knowledge of limited partner to limited partnership).[5]

Moreover, the principle advocated by BDO would have remarkable

---

[5] *Bedolla* rested in significant part on a statute very similar to D.C. Code § 29-601.03 (f). 125 Cal. Rptr. at 66 n.6. The California legislature subsequently enacted a statute restricting imputation of knowledge in the context of a limited partnership. *See* Cal. Corp. Code § 15901.03 (h) (2006). The D.C. Code contains a similar provision. D.C. Code § 29-701.03 (h) (2012 Repl.). BDO is a limited liability partnership, as opposed to a limited liability limited partnership. *Compare* D.C. Code § 29-601.02 (7) (2012 Repl.), *with* D.C. Code § 29-701.02 (7) (2012 Repl.). The parties appear to agree that § 29-601.03 (f) applies to BDO.

consequences for the application of statutes of limitations to partnerships. Partnerships are "non-corporeal entities." *Floyd v. Mayor & City Council*, 946 A.2d 15, 49 (Md. Ct. Spec. App. 2008). Thus, for a partnership to obtain knowledge, that knowledge must first be obtained by a partner or agent and then imputed to the partnership. *See Affiliated FM Ins. Co. v. Kushner Cos.*, 627 A.2d 710, 717 (N.J. Super. Ct. Law Div. 1993) ("The knowledge legally attributable to the partnership is the collective knowledge of [its] partners, employees and agents."); *cf., e.g.*, *Shiddell v. Bar Plan Mut.*, 385 S.W.3d 478, 486 (Mo. Ct. App. 2012) (corporation can obtain knowledge only through its agents) (internal quotation marks omitted). If the knowledge of partners and agents could not be attributed to the partnership in cases brought by the partnership alleging wrongdoing by a defendant, then the statute of limitations could never run in such cases. Even if a wrongdoer confessed its wrongdoing to all of the partners, the knowledge of the partners could not be imputed to the partnership, which apparently would have to be treated as though it were ignorant of what all of its partners actually knew.

Somewhat more narrowly, BDO contends that imputation is unwarranted because MLB had a fiduciary obligation to disclose information to BDO but nevertheless was actively trying to prevent BDO from learning about MLB's

conflicts of interest as well as the risks associated with TSG's activities. We are not persuaded that MLB's alleged efforts to hide information from BDO justify a refusal to impute to BDO the information that -- despite those alleged efforts -- actually was obtained by BDO partners not involved in the alleged wrongdoing. Even assuming that such a refusal of imputation could be squared with the language of § 29-601.03 (f), we do not see why courts should refuse to impute to the partnership information actually known by partners who were not involved in any alleged wrongdoing, simply because the defendant had attempted to prevent the partnership from learning that information. Once again, refusing to impute knowledge to the partnership in such circumstances would have remarkable consequences. Under that approach, if the defendant had attempted to keep a partnership from learning information about the defendant's wrongdoing, the statute of limitations could never run, because imputation would be precluded even if all of the partners nevertheless became fully aware of the wrongdoing.

BDO relies primarily on two cases to support its argument that MLB should not be permitted to rely on imputation. *See BCCI Holdings*, 964 F. Supp. at 478-80; *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 333-39 (Pa. 2010). Neither case involves a partnership or addresses the imputation principle

reflected in § 29-601.03 (f). *BCCI*, 964 F. Supp. at 478-80 (bank); *Allegheny*, 989 A.2d at 333-39 (corporation). Moreover, in each case the court refused to impute to a collective entity knowledge held by individuals who were allegedly involved in wrongdoing against the collective entity, whose interests were therefore adverse to those of the collective entity, and who thus could not reasonably have been expected to communicate their knowledge to others in the collective entity. *BCCI*, 964 F. Supp. at 478-80 (declining to impute to bank knowledge of officers who allegedly colluded with other "corrupt" bank officers and operated complex financial scheme leading to bank's financial collapse); *Allegheny*, 989 A.2d at 338-39 (refusing to impute to corporation knowledge of corporate officers involved in fraudulent activity with outside auditor).

The other cases relied upon by BDO are similarly distinguishable. None involves imputation of knowledge to partnerships for purposes of statutes of limitations or addresses the imputation principle reflected in § 29-601.03 (f). Several of the cases involve a refusal to impute knowledge held by individuals who were alleged to have been involved in wrongdoing against the collective entity, and thus could not reasonably have been expected to pass that knowledge along to the collective entity. *See, e.g.*, *Mutual Life Ins. Co. of New York v. Hilton-Green*, 241 U.S. 613, 622-23 (1916) ("[A]n innocent third party may properly presume . . . the

agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party . . . is acquainted with circumstances plainly indicating that the agent will not advise his principal."). Other cases relied upon by BDO involve imputation for purposes of imposing liability on corporations, which raises significant additional complexities. *See, e.g.*, *Allegheny*, 989 A.2d at 338-39 ("the ordinary rationale supporting imputation breaks down completely in scenarios involving secretive, collusive conduct between corporate agents and third parties").[6]

---

[6] It is true, as BDO notes, that some cases contain broad language that read in isolation might seem to suggest that "wrongdoers" can never rely on the imputation doctrine. *See, e.g.*, *NCP Litig. Trust v. KPMG LLP*, 901 A.2d 871, 882 (N.J. 2006) ("Allowing [defendant] to avoid liability for its allegedly negligent conduct would not promote the purpose of the imputation doctrine - to protect the innocent. . . . [O]ne who contributed to the misconduct cannot invoke imputation."). That broad language must be understood in context. *See Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 399-400 (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."); *Armour & Co. v. Wantock*, 323 U.S. 126, 132-33 (1944) ("It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court."); *Kraft v. Kraft*, 155 A.2d 910, 913 (D.C. 1959) ("It is well to remember that significance is given to broad and general statements of law only by comparing the facts from which they arise with those facts to which they supposedly apply."). Read in light of these principles, the cases cited by BDO do not substantially support the sweeping rule advocated by BDO in this case.

In sum, we conclude that, for purposes of determining whether an action brought by a partnership is time-barred, information known to members of the partnership who are not alleged to have been involved in the wrongdoing at issue generally may be imputed to the partnership.

**B.**

BDO also challenges the trial court's conclusion that, based on the knowledge of its partners other than the Individuals, BDO was on inquiry notice of its claims before December 30, 2005. First, BDO suggests that actual knowledge rather than inquiry notice should be required, given MLB's fiduciary obligations to make full disclosure to BDO as its client and MLB's affirmative efforts to prevent BDO from discovering the basis for the claims. Second, BDO argues that it did not have inquiry notice of MLB's conflict of interest or other wrongdoing -- namely, that MLB provided negligent advice with respect to the risks associated with TSG and failed to disclose those risks to BDO. We are not persuaded by BDO's contentions.

In legal-malpractice cases, a cause of action generally accrues for statute-of-limitations purposes when the plaintiff knows or by the exercise of reasonable

diligence should know of its injury, the injury's cause-in-fact, and some evidence of wrongdoing. *Ray v. Queen*, 747 A.2d 1137, 1141 (D.C. 2000). The statute of limitations requires only "that the plaintiff have inquiry notice of the existence of a cause of action." *Id*. Inquiry notice extends to "that [knowledge] which a plaintiff would have possessed after due investigation." *Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996) (Ruiz, J., concurring in part and dissenting in part).[7] "The critical question in assessing the existence . . . of inquiry notice is whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him." *Ray*, 747 A.2d at 1141-42. The analysis is "highly fact-bound" and requires an evaluation of all of the circumstances, including the conduct and misrepresentations of the defendant, the reasonableness of plaintiff's reliance on the defendant, and the existence of a fiduciary relationship between the parties. *Id.* at 1142; *Diamond*, 680 A.2d at 372, 376. Moreover, "the focus . . . is on when the plaintiff gained the *general* knowledge that [the defendant's conduct] was wrongful, not on when [the plaintiff] learned of the *precise* legal remedies for [that wrongful conduct]." *Ray*, 747 A.2d at 1142 n.7 (internal quotation marks and brackets omitted).

---

[7] Judge Kern joined Part II of Judge Ruiz's opinion in *Diamond*. 680 A.2d at 384. Except where otherwise noted, all subsequent citations to *Diamond* in this opinion are to Part II of Judge Ruiz's opinion.

BDO's contention that actual rather than inquiry notice should have been required is foreclosed by *Diamond*, 680 A.2d at 372-381. In *Diamond*, a client sued the law firm that had represented him, alleging fraud and breach of fiduciary and professional duties. The client argued that the law firm's fraud and fraudulent concealment of its wrongdoing delayed the accrual of his causes of action until he had "something close to actual notice" of his causes of action. *Id.* at 371. This court held, however, that the presence of fraud or fraudulent concealment on the part of a defendant does not affect the level of knowledge required by a plaintiff for a cause of action to accrue for purposes of the statute of limitations. *Id.* at 380-81. The court noted that a plaintiff who negligently fails to earlier discover a cause of action may not avoid the bar of the statute of limitations merely because misconduct on the part of the defendant is involved. *See id.* at 375-76. The court explained that "a focus on the plaintiff's diligence [in discovering his cause of action], rather than the defendant's misconduct, is more appropriate given the purpose of statutes of limitation to protect defendants from stale claims . . . ." *Id.* at 378.

Finally, we affirm the trial court's conclusion that, as a matter of law, BDO

was on inquiry notice of its claims.[8]  The undisputed facts establish that by 2005, based on knowledge possessed by partners and agents other than the Individuals, BDO knew or should have known that (1) MLB had provided BDO with advice downplaying the risk of TSG's activities; (2) during the same time period, MLB had negotiated broad indemnification agreements for the Individuals, exposing BDO to substantial liability relating to TSG's activities; (3) when TSG's activities came under investigation, MLB defended those activities in litigation on behalf of BDO, allegedly without advising BDO that TSG's activities might well be unlawful; (4) the IRS determined that TSG's activities were unlawful; and (5) when its clients sued BDO based on TSG's activities, BDO settled that suit for over $21 million.  Moreover, as the trial court concluded, this information should have led BDO to investigate further the representation it received from MLB.  Such an investigation would presumably have revealed all of the information BDO now relies upon in raising its claim.

We see no basis to quarrel with the trial court's decision that by 2005 BDO knew or should have known information that as a matter of law was sufficient to place BDO on inquiry notice of its claims.  In other words, BDO by 2005 had, or

_____

[8]  BDO contends that the trial court erred in finding that certain invoices placed BDO on inquiry notice of MLB's conflict of interest.  We do not rely on those invoices for purposes of the inquiry-notice analysis.

should have had, ample information to support its theories that (a) MLB negligently represented BDO by failing to competently assess the risks associated with TSG's activities; and/or (b) MLB violated its fiduciary obligations to BDO, because MLB appreciated those risks but improperly failed to disclose them to BDO, choosing instead to advance the contrary interests of the Individuals. *Cf. generally Diamond*, 680 A.2d at 384-89 (Ferren, J.) (concurring in pertinent part and upholding grant of summary judgment on statute-of-limitations grounds, because client was on inquiry notice of claims in legal-malpractice action against former law firm); 384 (Kern, J.) (concurring in part to Judge Ferren's opinion upholding grant of summary judgment).

In support of the contrary conclusion, BDO points to numerous pieces of information that it did not have and that it alleges MLB tried to hide. But the question is not whether BDO knew everything about its potential claims. Rather, the question is whether BDO had sufficient knowledge to place BDO on inquiry notice of its claim. We answer that question in the affirmative.[9]

---

[9] While this case was pending, BDO moved to disqualify the law firm of Gibson, Dunn & Crutcher LLP from representing MLB, on the ground that Gibson Dunn had previously represented BDO's general counsel in connection with a criminal investigation of TSG. The trial court denied the motion. We find no abuse of discretion. *See generally, e.g.*, *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 716 (D.C. 2013). BDO waived any conflicts of

(continued…)

The judgment of the Superior Court is therefore

*Affirmed.*

---

(…continued)

interests that could arise from Gibson Dunn's representation of MLB. Although the waiver did not specifically mention Gibson Dunn's previous representation of BDO's general counsel, BDO does not claim on appeal that it was unaware of that representation at the time it signed the waiver. Moreover, Gibson Dunn submitted an affidavit indicating that it had erected an ethical screen to ensure that any confidential information would be properly protected. Finally, BDO does not identify any concrete respect in which it was injured by Gibson Dunn's representation of MLB in this matter. Taken together, these circumstances adequately support the trial court's denial of the motion to disqualify Gibson Dunn.