989 A.2d 313

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF ALLEGHENY HEALTH EDUCATION AND
RESEARCH FOUNDATION, Appellant,

v.

PRICEWATERHOUSECOOPERS, LLP, Appellee.

Supreme Court of Pennsylvania.

Submitted Nov. 10, 2008.

Decided Feb. 16, 2010.

Beth Rochelle Heifetz, Patrick F. McCartin, Richard B. Whitney, James Michael Jones, Pittsburgh, for Official Committee of Unsecured Creditors of Allegheny.

Melanie Leigh Katsur, Gibson, Dunn & Crutcher, L.L.P., for Amicus Curiae Center for Audit Quality.

Alan F. Curley, Robinson Curley & Clayton, P.C., for Amicus Curiae International Association of Insurance Receivers.

Juliet M. Sarkessian, Robert C. Heim, Dechert LLP, Philadelphia, for Amicus Curiae National Association of Bankruptcy Trustees.

Jeffrey T. McGuire, Caldwell & Kearns, P.C., Harrisburg, for Amicus Curiae PA Institute of CPA's and American Institute of CPA's.

Joseph F. McDonough, Manion McDonough & Lucas, P.C., Pittsburgh, Thomas G. Rafferty, Antony L. Ryan, Cravath Swaine & Moore, L.L.P., for PriceWaterhouseCoopers, LLP.

Marcia Mary Waldron, U.S. Court of Appeals, 3rd Circuit, for United States Court of Appeals for the Third Circuit.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice SAYLOR.[1]

This case presents issues of Pennsylvania law on certification from the United States Court of Appeals for the Third Circuit, with the questions of first impression centering on the availability of an imputation-based *in pari delicto* defense in an auditor-liability scenario.

## I.

The background is set forth in the Third Circuit's certification petition. *See Official Comm. of Unsecured Creditors of AHERF v. PriceWaterhouseCoopers, LLP*, [hereinafter *AHERF Creditors' Comm. v. PwC* ], No. 07–1397, *slip op.*, 2008 WL 3895559, at *1 (3d Cir. July 1, 2008). Briefly, Allegheny Health, Education, and Research Foundation ("AHERF"), presently a debtor in liquidation under the United States Bankruptcy Code, is a Pennsylvania nonprofit corporation

---

1. This matter was reassigned to this author.

which operated hospitals, medical schools, and physicians' practices. From the late–1980s through the mid–1990s, AHERF management aggressively pursued acquisitions in furtherance of an integrated-delivery-system business model. Ultimately, this plan failed, precipitating the bankruptcy filing. Subsequently, a committee of creditors with authority conferred by federal bankruptcy law (the "Committee") commenced various causes of action against officers, insiders, and PriceWaterhouseCoopers, LLP ("PwC"), as successor to AHERF's auditor, Coopers and Lybrand ("C & L").[2]

The present action entails claims against PwC for C & L's alleged collusion with high-level AHERF officers, including its chief executive and financial officers, to fraudulently misstate AHERF's finances between 1996 and 1997. For example, the Committee contends that management overstated net income by more than $150 million and net unrestricted assets by more than $240 million in 1997.[3] According to the Committee, the objective was to create the impression that management strategy was effective, thus concealing the corporation's deepening insolvency and facilitating management's continuation of a

---

**2.** Such claims are generally pursued as "adversary proceedings" under federal bankruptcy law. *See* 28 U.S.C. § 1334(b). As is frequently the case in such matters, the present one encompasses various applications of state law in a federal bankruptcy setting.

**3.** The following excerpts from the Committee's brief offers some additional flavor of its contentions:

Forensic accounting and auditing experts retained by the Committee have testified that Coopers's audits in 1996 and 1997 were riddled with violations of [generally accepted accounting standards ("GAAS")]. Coopers failed to require AHERF to correct non-GAAP accounting and failed to make mandatory reports to AHERF's Audit Committee. Coopers failed to report patent violations of GAAP accounting and other matters that directly called into question the integrity of AHERF's financial management. Coopers's failures resulted in audited financial statements that grossly misstated AHERF's financial performance and condition but carried Coopers's clean opinions nonetheless.

\* \* \*

Coopers's misconduct goes beyond failure to recognize inappropriate accounting treatments or failure to detect intentional misstatements or accounting irregularities. Coopers knowingly and actively facilitated the financial misconduct.

Brief for the Committee at 8 (citations omitted);

ruinous business strategy while thwarting essential, remedial intervention by the board of trustees. *See* Committee Brief at 14 ("Had Coopers performed its audits in compliance with GAAS, AHERF's trustees and its creditors could and would have intervened and put a halt to a growth strategy that could not be afforded.").[4] The claims were predicated on theories, asserted under Pennsylvania law, of breach of contract, professional negligence, and aiding and abetting a breach of fiduciary duty. The Committee sought damages equal to the "full extent of [AHERF's] insolvency," or over one-billion dollars.

PwC moved for summary judgment. The core factual basis for its defense was the participation of AHERF officers in the asserted fraud, since they provided C & L with false financial statements in the first instance. According to PwC's theory, such fraud is properly imputed to the officers' principal, AHERF. PwC then asserted that, regardless of whether or not C & L's own agents knew that the financial statements were false, where the culpability of the plaintiff (the Committee, standing in AHERF's shoes) is at least as great as that of the defendant (PwC, standing in C & L's shoes), the action is barred by *in pari delicto potior est conditio defendentis* (meaning in a case of equal or mutual fault the position of the defending party is the stronger one). *See generally Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306–07, 105 S.Ct. 2622, 2626–27, 86 L.Ed.2d 215 (1985) (discussing the *in pari delicto* defense).

The district court found such theory to be a valid application of Pennsylvania law and awarded summary judgment. In so ruling, the court relied in the first instance on a general rule, deriving from agency-law principles, that fraudulent conduct of a corporate officer is imputed to the corporation if committed in the course of the officer's employment and for the

4. The Committee contends that another effect was to "substantially enhance the bonus-driven net income-tied compensation of AHERF's CEO, CFO, and other members of senior management—the same people who were responsible for and prepared the [financial] statements and who hired and retained Coopers to audit them." Committee Brief at 3.

benefit of the corporation. *See AHERF Creditors' Comm. v. PwC*, No. 2:00cv684, *slip op.* at 14, 2007 WL 141059 (W.D.Pa. Jan. 17, 2007) (citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358–59 (3d Cir.2001)). *See generally Gordon v. Continental Casualty Co.*, 319 Pa. 555, 565, 181 A. 574, 577–78 (1935) ("A corporation shall be held responsible for the knowledge which is possessed by those whom it appoints to represent it. From the nature of its constitution it can have no other knowledge than that of its officers, and, in dealing with such officers, as with the corporation itself, third parties have a right to consider that what they know it knows." (citation omitted)). The court reasoned that the preparation and presentation of financial statements, albeit false ones, to an auditor was within the course of the employment of AHERF's senior management. Further, it determined that the corporation benefitted, at least in the short term, from the fraudulent conduct of its officers. *See AHERF Creditors' Comm. v. PwC*, No. 2:00cv684, *slip op.* at 20 ("Clearly, if during the periods relevant to the misstated financial statements, AHERF made acquisitions of other hospitals, physician practices and/or educational facilities, then over the immediate short term AHERF did indeed benefit. The benefits to AHERF include an increase of its assets and the addition of income streams.").

In response to the Committee's argument that the officers' interests were in fact adverse to the corporation, thus triggering an "adverse-interest exception" to the general rule of imputation, the district court reasoned that such exception applies only if the corporation "received no benefit" from the officers' improper conduct. *AHERF Creditors' Comm. v. PwC*, No. 2:00cv684, *slip op.* at 16 (citing *In re Phar–Mor, Inc. Securities Litig.*, 900 F.Supp. 784, 786 (W.D.Pa.1995) ("A corporation is not imputed with 'knowledge of an agent in a transaction in which the agent secretly is acting adversely to the [corporation] and entirely for his own or another's purposes'" (citation and emphasis omitted))). Referencing a decision of a federal intermediate appellate court, the district court also determined that short-term benefit to the corpora-

tion associated with the acquisition of hospitals, physician practices and/or educational facilities accrued to the corporation, thereby preventing the application of the adverse-interest exception to imputation. *See id.* at 18–19 (citing *Baena v. KPMG LLP,* 453 F.3d 1, 7–8 (1st Cir.2006) ("A fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company; but, like price-fixing, it profits the company in the first instance and the company is still civilly and criminally liable . . .[; n]or does it matter that the implicated managers also may have seen benefits to themselves—that alone does not make their interests adverse.")).

The district court also was not persuaded by the Committee's attempt to invoke an "innocent decision-maker" exception to imputation on the ground that, if members of AHERF's board of trustees had been made aware of the corporation's actual financial condition, they could have taken corrective measures. The court reasoned that such a limitation deviates from traditional agency doctrine and Pennsylvania agency law. *See AHERF Creditors' Comm. v. PwC,* No. 2:00cv684, *slip op.* at 23 (citing, *inter alia, Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 570–74, 102 S.Ct. 1935, 1944–47, 72 L.Ed.2d 330 (1982)). In this regard, and in summary, the court stated:

> Despite the averments of the Committee regarding the decade long business strategy consisting of ill-conceived, ill-advised mergers and acquisitions, and despite the intentional accounting misstatements by AHERF management, the Committee lays AHERF's entire bankruptcy at the feet of its outside auditors. The very harm allegedly suffered at the hands of PwC, however, presupposes the Board approved business strategy, as well as the imputable wrongdoing of AHERF's management. The Court, therefore, finds no equitable bar to either the imputation of the misdeeds of AHERF management to AHERF or to the application of the doctrine of *in pari delicto.*

*Id.* at 24. An appeal to the Third Circuit followed, in which context the federal intermediate appellate court lodged the present certification request.

In its certification petition, the Third Circuit framed the issues by explaining that AHERF's chief financial officer is alleged to have knowingly falsified corporate finances, assisted by agents of C & L who issued a "clean" audit statement despite their own knowledge of the fraud, thus deceiving AHERF's board of trustees to the ultimate detriment of the non-profit corporation. *See AHERF Creditors' Comm. v. PwC,* No. 07–1397, *slip op.,* 2008 WL 3895559, at *2. The court then posed the question of whether imputation should apply, followed by an inquiry into the viability of PwC's *in pari delicto* defense under Pennsylvania state law. *See id.* at *3, *6.

Regarding imputation, the court observed that the question is presented in a factual context in which the party invoking imputation (PwC, as successor to C & L) is not an innocent third party; rather, C & L agents purportedly conspired with AHERF officers in bringing about the alleged harm to the client-corporation. It noted that the scenario raises novel questions concerning the degree to which imputation may be utilized as a shield benefitting wrongdoers. The Third Circuit found this variation particularly significant, since the rationale supporting imputation is grounded, at least in part, on the protection of innocent third parties who do business with agents of the principal. *See id.* at *4 (citing *Aiello v. Ed Saxe Real Estate, Inc.,* 508 Pa. 553, 559, 499 A.2d 282, 285 (1985)). While seemingly the court's own precedent favored PwC's position, *see Lafferty,* 267 F.3d at 360 (applying imputation in favor of parties alleged to have participated in wrongdoing), the court recognized that some other jurisdictions had taken a more restrictive view of imputation-based defenses, finding their broad application in the corporate auditing setting to be incompatible with the interests of justice. *See AHERF Creditors' Comm. v. PwC,* No. 07–1397, 2008 WL 3895559, at *4 (citing *NCP Litig. Trust v. KPMG, LLP,* 187 N.J. 353, 901 A.2d 871, 882 (2006) (explaining that "the rationale for imputa-

tion in a simple principal-agent relationship begins to break down in the context of a corporate audit where the allocation of risk and liability among principals, agents, and third parties becomes more complicated.")); *cf. In re Jack Greenberg, Inc.,* 212 B.R. 76, 90 (Bankr.E.D.Pa.1997) (recognizing that the "framework for an accountant liability case does not fit squarely into the well developed agency law concerning imputation").

The Third Circuit concluded that resolution of the many competing concerns flowing from the extension, or refusal to extend, a broad imputation rule to the auditor liability setting requires a policy judgment best left to this Court, particularly in light of the magnitude and importance of the question to the Commonwealth. Therefore, the court asked that we set out the "appropriate test under Pennsylvania law for deciding whether imputation is appropriate when the party invoking that doctrine is not conceded to be an innocent third party but an alleged co-conspirator in the agent's fraud." *AHERF Creditors' Comm. v. PwC,* No. 07–1397, 2008 WL 3895559, at *4

On the broader question of the availability of an *in pari delicto* defense in Pennsylvania in the first instance, the Third Circuit characterized *in pari delicto* as "an ill-defined group of doctrines" and "a murky area of the law." *Id.* at *5. The court recognized the general unavailability of the defense for corporate directors alleged to have breached their fiduciary duties, and, concomitantly, questioned the degree to which it should be available to benefit those who have aided and abetted this sort of conduct. *See id.* It concluded:

> Given the questions surrounding the *Lafferty* holding, the need for clarification of the *in pari delicto* doctrine under Pennsylvania law, and the presence of the aiding and abetting cause of action, we believe that the best course is to request that the Pennsylvania Supreme Court clarify the contours of *in pari delicto* under Pennsylvania law.

*Id.*

The Third Circuit's explanation was followed by the framing of two discrete legal issues as follows:

1. What is the proper test under Pennsylvania law for determining whether an agent's fraud should be imputed to the principal when it is an allegedly non-innocent third-party that seeks to invoke the law of imputation in order to shield itself from liability?

2. Does the doctrine of *in pari delicto* prevent a corporation from recovering against its accountants for a breach of contract, professional negligence, or aiding and abetting a breach of fiduciary duty, if those accountants conspired with officers of the corporation to misstate the corporation's finances to the corporation's ultimate detriment.

*Id.* at *6. We accepted certification of these questions per our operating procedures. *See* Supreme Court Internal Operating Procedures § 10.[5]

In its brief, the Committee couches *in pari delicto* as an equitable affirmative defense which should not be applied to produce an inequitable result. In particular, the Committee derives support from *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 555, 244 A.2d 10, 14 (1968) (holding that a bankruptcy trustee was not subject to the equitable "unclean hands" defense against a party that allegedly defaulted on a contract where, among other considerations, denying recovery for the estate would "result in the enrichment of [the breaching party] at the expense of the innocent creditors of the bankrupt [plaintiff]"). The Committee posits that no equities could be served by invoking *in pari delicto* to favor an auditor who conspires or colludes with corporate officers to misstate the corporation's financial statements.

In terms of the general, agency-law based rule of imputation, the Committee advocates implementation of exceptions to avoid shielding a wrongdoing auditor from liability to a company harmed by the auditor's malpractice. In support of such exceptions, and in line with the Third Circuit's comments, the

5. Although the Third Circuit and the parties discuss imputation as the threshold issue, and there is certainly logic supporting such approach, our preference is to begin with the underlying *in pari delicto* defense. We have thus reordered the parties' arguments in our discussion below.

Committee stresses the grounding of imputation doctrine in the protection of innocents. *See* Committee Brief at 22 ("[N]o innocents will be protected when a wrongdoing auditor seeks to impute to a financially devastated corporation the bad acts of the very corporate financial managers that the auditing firm was paid to monitor."). Additionally, the Committee highlights the Third Restatement of Agency and, in particular, the following comment:

A principal may retain a service provider on terms or for tasks that make imputation of agents' knowledge irrelevant to subsequent claims that the principal may assert against the service provider. For example, a principal may retain a service provider to assess the accuracy of its financial reporting or the adequacy of its internal financial controls or other internal processes, such as its processes for reporting and investigating complaints of harassment in the workplace. If the service provider fails to detect or report deficiencies, the principal's claim against the service provider should not be defeated by imputing to the principal its agents' knowledge of deficiencies in the process under scrutiny.

Restatement (Third) of Agency § 5.03 cmt. b (2006); *accord id.* at § 5.04 cmt. b ("[I]mputation protects innocent third parties but not those who know or have reason to know that an agent is not likely to transmit material information to the principal.").

As to the particular exceptions, the Committee first advances the adverse-interest exception based on its proffer that the misdeeds of AHERF's officers were motivated by their interest in preserving their positions and personally profiting from their extended tenure. *Accord Phar–Mor*, 900 F.Supp. at 786–87; *Buckley v. Deloitte & Touche USA LLP*, No. 06–3291, 2007 WL 1491403, at *5–7 (S.D.N.Y. May 22, 2007). Responding to the district court's position that any benefit to the corporation is sufficient to negate the adverse-interest exception, the Committee suggests such understanding resulted from a misreading of this Court's decision in *Todd v. Skelly*, 384 Pa. 423, 120 A.2d 906 (1956). *See id.* at 429, 120

A.2d at 909 ("Where an agent acts in his own interest which is antagonistic to that of the principal, or commits a fraud for his own benefit in a matter which is beyond the scope of his actual or apparent authority or employment, the principal who has received *no benefit* therefrom will not be liable for the agent's tortious act." (emphasis added)). According to the Committee, the district court errantly converted a simple, fact-specific comment from *Todd* into an overarching legal rule, which was never intended by this Court. Furthermore, the Committee criticizes the district court's finding of a benefit in the perpetuation, through alleged fraudulent collusion, of a harmful business strategy fostering deepening insolvency. *Accord Thabault v. Chait,* 541 F.3d 512, 529 (3d Cir.2008) ("Given that [the chief executive officer's] conduct allowed [the insurance company] to continue past the point of insolvency, his actions cannot be deemed to have benefited the corporation."); *Schacht v. Brown,* 711 F.2d 1343, 1348 (7th Cir.1983) ("We do not believe that such a Pyrrhic 'benefit' " to the corporation "is sufficient to even trigger the ... analysis which seeks to determine the propriety of imputing to the corporation the directors' knowledge of fraud."). At the very least, the Committee asserts, the matter is fact-based and, therefore, unsuited for resolution at the summary judgment stage.[6]

The Committee distinguishes the primary authority relied upon by the district court, *Baena, inter alia,* on the ground that it involved a for-profit corporation with stockholders; whereas, AHERF, as a nonprofit corporation, had no trading stock the price of which could be manipulated and which could then be traded for assets. Thus, the Committee maintains, the *Baena* court's finding of such benefit to the corporation deriving from similar misconduct on the part of corporate officers and auditors does not pertain here. Moreover, according to the Committee, because many of AHERF's acquisi-

6. *See* Committee Reply Brief at 9 ("No evidence in the summary judgment record could support the proposition that the wrongdoing was perpetrated for AHERF or that it benefitted AHERF. And PwC cites none.... The accounting machinations and audit misbehavior here were directed at the principal—at enabling the officers to maintain their bonus-driven money grab and enabling Coopers's engagement partner to maintain his valued and largest client.").

tions were of money-losing enterprises—and the relevant ones were made in reliance on misstated financial statements—such acquisitions caused AHERF only additional financial loss. *See, e.g.,* Committee Reply Brief at 11 n. 5 ("Indeed, the tens of millions of dollars in cash laid out, debt assumed, and operating losses incurred as a result of these same acquisitions did nothing but help push the company into bankruptcy and form, in significant part, the basis of the Committee's damage measures." (citing JA3211–32212, JA3223–3254)).

In any event, the Committee contends, the litmus for adverse interest lies in the subjective motivation of the agent-actor, not incidental or unintended benefit resulting from the action. *See* Committee Brief at 12–13 (citing *Reich v. Compton*, 57 F.3d 270, 279 (3d Cir.1995) (reflecting a similar position in the context of an alleged party-in-interest transaction under the federal Employee Retirement Income Security Act)). The Committee also maintains that there is no requirement for the agent-actor to have proceeded "entirely" out of self-interest. For the latter proposition, the Committee references the language from *Todd* previously discussed. *See Todd*, 384 Pa. at 429, 120 A.2d at 909.

Next, the Committee argues that the law recognizes a separate "collusion" exception to the general rule of imputation, with such exception being particularly appropriate in the context of collusive conduct by an auditor invested with an independent professional duty to report management fraud to a board of directors or trustees. *See* Committee Reply Brief at 2 ("The Committee ... advocates for rules that promote appropriate corporate oversight of financial management and, at the same time, recognize the import of the obligations assumed by auditors in meaningful, independent financial statement audits—audits that are themselves a critical tool in that corporate oversight and monitoring."). In this regard, the Committee references various federal and state decisions lending support to its position.[7] In its reply brief, the Com-

7. *See BCCI Holdings (Luxembourg), S.A. v. Clifford*, 964 F.Supp. 468, 480 (D.D.C.1997) (imputation "may not be invoked" where a professional "colludes with the agent in acting adversely to the principal");

mittee also highlights a concession by PwC that an auditor which colludes with officers of its audit clients to defraud that client may not invoke imputation.

Finally, the Committee favors adoption of an innocent decision-maker exception to imputation, *see, e.g., In re Adelphia Commc'ns Corp.,* 365 B.R. 24, 57 (Bankr.S.D.N.Y.2007), which was disapproved by the district court in *AHERF*.

PwC, on the other hand, portrays the *in pari delicto* defense as a substantive right of defendants, as distinguished from a loose, discretionary, equitable precept. PwC contends that Pennsylvania law embodies an exceptionally strong variant of the defense, which would apply in all instances in which a plaintiff can be said to be in equal, or mutual, fault with the defendant, and without any further assessment of equitable matters or considerations of public policy. *See* Brief for PwC at 34–35 (citing *Feld & Sons v. Pechner, Dorfman, Wolfee, Rounick & Cabot,* 312 Pa.Super. 125, 133–38, 458 A.2d 545, 549–52 (1983)).[8]

In re Sunpoint Sec., Inc., 377 B.R. 513, 563 (Bankr.E.D.Tex.2007) ("The rule of imputation under Texas law ... does not protect those who collude with the agent to defraud the principal."); *In re Jack Greenberg, Inc.,* 240 B.R. 486, 508 n. 29 (Bkrtcy.E.D.Pa.1999) (collecting auditor-liability cases in which courts disapprove "imputation defense" where auditor "has colluded with the corporation's wrongful agent"); *NCP Litig. Trust v. KPMG LLP,* 187 N.J. 353, 901 A.2d 871, 882 (2006) (explaining that the imputation doctrine exists to protect innocent third parties from being sued by corporations whose agents have engaged in malfeasant behavior against those third parties, but, "[w]hen the agent is in collusion with a third person to defraud the principal, the latter will not be responsible for the knowledge of the agent in relation to such fraud" (quoting *Hickman v. Green,* 123 Mo. 165, 27 S.W. 440, 443 (1894))); *American Int'l Group, Inc. v. Greenberg,* 965 A.2d 763, 807 (Del.Ch.2009) ("Delaware law provides no safe harbor to high-level fiduciaries who group together to defraud the board."). *See generally* Restatement (Third) of Agency § 5.03 cmt. b and § 5.04 cmts. b and c, illus. 4 and 5.

8. *See also id.* at 36–37 ("The only cases we have identified in which this Court has declined to apply *in pari delicto* are where there is a gross inequity of position, and a stronger party oppresses or takes advantage of a weaker one.... These decisions are based not on unbounded concepts of general equity, but on the legal conclusion that the defendant is far more at fault than the plaintiff." (citing *Peyton v. Margiotti,* 398 Pa. 86, 92–93, 156 A.2d 865, 868–69 (1959), *Palmer v. Foley,* 305

PwC's reasoning, in this respect, is based upon its understanding that application of *in pari delicto* lacks the sort of moral dimension associated with the cognate, equitable maxim of unclean hands.[9] PwC references the lead opinion in *Lucey v. WCAB (Vy–Cal Plastics PMA Group)*, 557 Pa. 272, 279, 732 A.2d 1201, 1204 (1999) (plurality), as supporting the notion that actions at law concern only the "rights and liabilities of the parties," and as enforcing a sharp divide between law and equity in terms of the advancement of moral ends. *See* Brief for PwC at 47 ("Because of its origins in equity, the 'unclean hands' doctrine has a moral component not present with *in pari delicto* ").

It is on this basis that PwC distinguishes *Universal Builders*, as the case proceeded in equity as opposed to at law, and the defendant asserted the equitable defense of "unclean hands." *Id.* at 552–54, 244 A.2d at 12–14. PwC recognizes that some courts have equated *Universal Builders'* analysis of unclean hands with *in pari delicto. See Adelphia*, 365 B.R. at 48 ("This Court thus believes that under the law of Pennsylvania, as articulated in *Universal Builders*, consideration of the applicability of the doctrine of unclean hands or *in pari delicto* is not a mechanical application of the law of agency, but rather involves discretionary attention to the fairness of applying it to the facts in a given case."); *In re Jack Greenberg, Inc.*, 240 B.R. 486, 505–06 (Bankr.E.D.Pa.1999). According to PwC, however, such courts inappropriately confused the respective defenses and are simply mistaken in their prediction of this Court's treatment. *See id.* (citing *In re Adelphia*, 365 B.R. at 48).

In its discussion, PwC stresses that this Court has never restricted *in pari delicto* to particular causes of action. PwC observes that the defense is employed in the contract setting

Pa. 169, 175–76, 157 A. 474, 476 (1931), and *Thomas v. Shoemaker*, 6 Watts & Serg. 179, 183 (1843))).

9. As support, PwC cites, *inter alia, Reading Indus. Mfg. Co. v. Graeff*, 64 Pa. 395, 402 (1870) (referencing the principle that contracts in violation of a statute are unenforceable, albeit the parties may be *in pari delicto*, "however ungracious and abhorrent to our sense of justice such a defence may be" in the particular case).

to bar breach-of-contract claims where the plaintiff bears at least equal fault, *see, e.g., N.Y. & Pa. Co. v. Cunard Coal Co.,* 286 Pa. 72, 84, 132 A. 828, 831 (1926), as it has been employed to bar negligence actions, *see, e.g., Pinter v. James Barker, Inc.,* 272 Pa. 541, 544, 116 A. 498, 498 (1922) (citing *McCool v. Lucas Coal Co.,* 150 Pa. 638, 24 A. 350 (1892)), and claims of fraud, *see, e.g., Jackson v. Thomson,* 222 Pa. 232, 240, 70 A. 1095, 1097 (1908). On these arguments, PwC contends that *in pari delicto* bars all causes of action asserted against it by the Committee on account of the misconduct of AHERF's officers. *See* Brief for PwC at 34–35 ("Where a sophisticated corporate entity with in-house certified public accountants deliberately misstates its own financial statements and withholds material information from its outside auditor, the corporation bears at least equal fault as the auditor who did not detect the corporation's fraud (or even is alleged to have aided and abetted that fraud)."). It is PwC's position that adoption of the Committee's position would represent an effective elimination of *in pari delicto* from the auditor-liability setting, and would permit corporations to shift responsibility for their own agents' misconduct to third parties (such as PwC) who were less at fault than the corporation itself. PwC claims such a rule would not only be unfair to third parties dealing with corporations, but unwisely would reduce the incentives for corporations in selecting and monitoring their agents.

Particularly in its framing of its arguments concerning imputation, PwC vigorously denies the Committee's allegations of negligence or wrongdoing on its part; moreover, at least initially, it dismisses such allegations as irrelevant. Instead, PwC points to the culpability of AHERF officers in terms of the company's downfall. *See, e.g.,* Brief for PwC at 30 ("AHERF's managers chose to pursue a growth strategy for the corporation that was ill-conceived and poorly executed. When the strategy began to fail, they artificially inflated AHERF's financial results to enable the company to continue it's growth strategy."). According to PwC, and in line with the district court's reasoning, the managers' wrongdoing was perpetrated in the course of their employment and for AH-

ERF's benefit, and, therefore, a straightforward application of longstanding principles of agency law requires attribution of the conduct to the corporation. In particular, PwC highlights passages from Pennsylvania decisions explaining that a principal is liable for an agent's actions "even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment." *Travelers Cas. & Sur. Co. v. Castegnaro*, 565 Pa. 246, 252, 772 A.2d 456, 460 (2001); *accord Aiello*, 508 Pa. at 559, 499 A.2d at 285.

From this frame of reference, *i.e.*, that of a non-collusive auditor, PwC also invokes various passages of the Third Restatement of Agency, including the following comment from Section 5.03:

If a principal's agents fail to disclose or misstate material information to a third party who provides services to the principal, the agents' conduct may result in flawed work by the service provider. The agents' conduct may provide a defense to the service provider, if sued by or on behalf of the principal, on the basis that the agents' knowledge, imputed to the principal, defeats a claim that the principal relied on the accuracy of the work done by the service provider. Subject to § 5.04, the agents' knowledge is imputed to the principal as a matter of basic agency law.

Restatement (Third) of Agency § 5.03, cmt. b. According to PwC, "AHERF's officers withheld material information from C & L and affirmatively gave C & L false information, and as a result C & L's audit did not detect the fraud. C & L may defend against AHERF's claim by imputing those officers' knowledge to AHERF as a matter of law." Brief for PwC at 24.

Moreover, PwC distinguishes the Restatement comments relied on by the Committee by suggesting that C & L's duties were to "perform only a regular financial-statement audit," Brief for PwC at 24, not to "assess the accuracy of [AHERF's] financial reporting or the adequacy of its internal financial controls," Restatement (Third) of Agency § 5.03 cmt. b. In

this regard, PwC references professional standards distinguishing between these types of engagements. *See* Codification of Statements on Auditing Standards Numbers 1 to 73, Including Statements on Standards for Attestation Engagements (AICPA 1995), at 95, 805.[10]

Although several of PwC's arguments hinge on its position that C & L agents did not engage in fraudulent conduct, it also argues (as it ultimately must in light of the Third Circuit's recitation and framing of the second certified issue) that imputation applies even if the Committee were to prove its averment that C & L agents colluded with AHERF officers as alleged. In this regard, PwC recognizes the legitimacy of a "collusion exception" to the general rule of imputation, but it contends this exception is limited to circumstances where an agent and the third party conspire to commit a fraud *against* the principal.[11] PwC substantially relies on this Court's *Gordon* decision as supportive of this line of its argument. *See Gordon*, 319 Pa. at 566, 181 A. at 578 ("However applicable the dictum that an agent about to commit a fraud will not announce his intention may be in the case of fraud upon his own principal, it has no application when the agent acting in its behalf or ostensibly so commits a fraud upon a third person." (quoting 3 SEYMORE D. & JOSEPH W. THOMPSON, COMMENTARIES

10. PwC does recognize that C & L undertook the obligation to "inform [AHERF] of matters that come to [C & L's] attention" in the course of the audit "that represent significant deficiencies in the design or operation of the internal control structure." Brief for PwC at 24–25. Accordingly, its arguments to this point remain centered on the perspective of a non-collusive auditor, since it is difficult to conceptualize a scenario in which an auditor with knowledge of pervasive management fraud in reporting financial information would not be required to disclose such fraud in accordance with the above commitment.

11. Brief for PwC at 26 (citing 2 FLOYD R. MECHEM, A TREATISE ON THE LAW OF AGENCY § 1826, at 1412 (2d ed. 1914) (indicating imputation does not apply in favor of a third party "who has conspired with the agent to defraud the principal"); Restatement (Third) of Agency § 5.04 cmt. c ("A principal should not be held to assume the risk that an agent may act wrongfully in dealing with a third party who colludes with the agent in action that is adverse to the principal.")). *See generally* 3 WILLIAM M. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 829 (2009) ("Fraud on behalf of a corporation is not the same thing as fraud against it.").

ON THE LAW OF CORPORATIONS § 1778, at 347 (3d ed. 1927))).
Additionally, PwC references a line of cases following *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.1982), a groundbreaking decision in the auditor-liability setting. *See* Brief for PwC at 27.

In rebutting the Committee's perspective that the imputation device serves solely to protect innocents, PwC references *Corn Exchange National Bank & Trust Co. v. Burkhart,* 401 Pa. 535, 544–45, 165 A.2d 612, 616 (1960) (discussing the rule that a principal-plaintiff is charged with the knowledge and conduct of his agents in conducting a transaction within the scope of their employment, in a context in which the defendant was alleged to have known the transaction was fraudulent), and the Superior Court's in *Brickman Group, Ltd. v. CGU Ins. Co.,* 865 A.2d 918, 925 (Pa.Super.2004) (applying *in pari delicto* in the context of an illegal contract, apparently with fault on both sides). PwC also suggests the primary justification for imputation actually derives from the notion that a principal should bear responsibility for those it has placed in a position of trust and confidence. *See Aiello,* 508 Pa. at 559, 499 A.2d at 285–86. Again, PwC catalogues references to *in pari delicto* in connection with the application of comparative negligence principles in the tort arena, *see, e.g., Smalich v. Westfall,* 440 Pa. 409, 416, 269 A.2d 476, 481–82 (1970), and in the contract area in association with the prohibition against enforcement of an illegal contract, *see Brickman Group,* 865 A.2d at 925, settings in which opposing parties may be at fault. *Accord* Restatement (Third) of Agency § 5.03 cmt. b ("Defenses such as *in pari delicto* may bar a plaintiff from recovering from a defendant whose conduct was also seriously culpable."). It is PwC's position that the Committee's approach of curtailing imputation where the defendant is to some degree at fault renders the doctrine of *in pari delicto* meaningless as to corporate bodies, since corporations can act only through their agents.

In terms of the mechanics of general imputation theory, PwC supports the district court's "any benefit" approach to the adverse-interest exception, and the corollary perspective

that an agent must act entirely from self-interest for imputation to be avoided.[12] PwC also counters the Committee's position that the adverse-interest exception turns on the agent's subjective intent and motivation, noting the Committee cites no legal authority for such proposition. Furthermore, according to PwC, a purely subjective test would undermine essential predictability in relationships between third parties and agents. It maintains the distinction between fraud on, and fraud on behalf of, a corporation applies in this setting as well. *See, e.g.*, Brief for PwC at 27–28 ("Therefore, the District Court rightly concluded that, just as in *Baena*, '[m]anagement's scheme to misrepresent the financial condition of the company in this instance permitted AHERF to grow as a company, which was a benefit to AHERF.' " (quoting *AHERF Creditors' Comm. v. PwC*, No. 2:00cv684, *slip op.* at 21)).

More broadly, PwC expresses concern that auditors should not be singled out for an *ad hoc* "wrongdoing auditor" exception to general imputation rules, and thus uniquely disabled from invoking imputation. PwC regards the New Jersey Supreme Court's decision in *NCP* as applying such an exception, *see supra* note 7, but it characterizes *NCP* as "an outlier case." Brief for PwC at 22. In this regard, PwC highlights the *NCP* dissent's criticism of a legal rule allowing "that simple negligence and breach of contract claims are sufficient to strip from the third party the right to reasonably rely on representations made by duly appointed and constituted corporate officers in the course and scope of their employment—a

12. In this regard, PwC cites as instructive: *Todd*, 384 Pa. at 429, 120 A.2d at 909; *Aiello*, 508 Pa. at 559–60, 499 A.2d at 285–86 (imputing the fraudulent representations of a real estate agent because "his principal cannot *benefit* of his act and at the same time repudiate his authority" (emphasis added)); *Gordon*, 319 Pa. at 562, 181 A. at 576 ("A principal is not affected by the knowledge of an agent in a transaction in which the agent is acting adversely to the principal and *entirely* for his own or another's purposes." (quoting Restatement of Agency § 282(1) (emphasis added)); and the Third Circuit's *Lafferty* decision. *See also Gordon*, 319 Pa. at 562, 181 A. at 577 ("The mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests.").

reasonable reliance strongly engrained in our case law[.]" *NCP*, 901 A.2d at 896–97 (Rivera–Soto, J., dissenting). PwC observes that, according to the dissent, this "eviscerates the doctrine of constructive notice." *Id.* By way of contrast to *NCP*, PwC offers decisions from several other courts which have imputed management fraud to plaintiff corporations and entered judgments for auditors.[13]

Finally, PwC argues the Committee cannot be treated as an "innocent successor," because it voluntarily stepped into AH-ERF's shoes to bring its claims.

This matter has drawn *amici* submissions, which we appreciate, from: the National Association of Bankruptcy Trustees ("NABT") and the International Association of Insurance Receivers, supporting the Committee; and the American and Pennsylvania Institutes of Certified Public Accountants (collectively the "Accountant Institutes") and the Center for Audit Quality, supporting PwC. The Committee's *amici* focus substantially on the position that actions pursued by bankruptcy trustees and creditors' committees should not be necessarily subject to defenses which would have been available against the debtor. For example, NABT argues:

> As the *Jack Greenberg* bankruptcy court observed, following *Universal Builders* ensures that Pennsylvania's objectives of tort liability are served. *Jack Greenberg*, 240 B.R. at 508. "The primary objectives of tort liability in Pennsylvania are compensating the victims of harm and preventing the occurrence of harm in the future by deterring wrongful conduct." *Id.* at 512 (collecting Pennsylvania state cases). In that case, the goal of deterrence was served by "subjecting the auditors to potential liability, thereby encouraging greater diligence by them in such situations in the future."

---

**13.** *See* Brief for PwC at 23 (citing *Baena*, 453 F.3d at 1; *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir.2003); *FDIC v. Ernst & Young*, 967 F.2d 166 (5th Cir.1992); *Cenco*, 686 F.2d at 449; *MCA Fin. Corp. v. Grant Thornton, LLP*, 263 Mich.App. 152, 687 N.W.2d 850 (2004); *Mid–Continent Paper Converters, Inc. v. Brady, Ware & Schoenfeld, Inc.*, 715 N.E.2d 906 (Ind.Ct.App.1999); *Miller v. Ernst & Young*, 938 S.W.2d 313 (Mo.Ct. App.1997); and *Seidman & Seidman v. Gee*, 625 So.2d 1 (Fla.Dist.Ct. App.1992)).

*Id.* at 514. And, because the action had been commenced by a Chapter 7 trustee for the benefit of innocent creditors, the bankruptcy court was "not concerned that allowing this litigation to proceed on its merits would allow a wrongdoer to benefit contrary to the objective of tort liability that only victims be compensated." *Id.* at 517; *see also id.* at 511–12 (citing *In re Phar–Mor[ ]*, 900 F.Supp. [at 787] (explaining that "the objectives of tort liability, to wit, compensation of victims of wrongdoing and deterrence of future wrongdoing" would be served if the litigation trust, as successor to the debtor, ultimately prevailed on the debtor's claims against its former accounting firm as any recovery would inure to the benefit of creditors having an interest in the trust)).

Brief for *Amicus* NABT at 17. NABT notes that neither *Lafferty* nor the *AHERF* district court accounted for *Universal Builders*, discussed Pennsylvania's policy against extending equitable doctrines to shield wrongdoers to the detriment of innocent parties, or mentioned the objectives of Pennsylvania's tort-liability scheme.

PwC's *amici*, on the other hand, supplement the arguments with a discussion of systemic risks faced by auditors subject to liability in scenarios involving rogue corporate officers, which may affect the insurability and viability of auditing concerns. For example, the Accountant Institutes argue:

> The deleterious effects to the profession, and ultimately to the public, from the positions advocated by the Committee and its *amici* are several. First, allowing a client that perpetrated a fraud to shift its own responsibility for preventing and detecting fraud to the outside auditor will require auditors to expand the scope of audits, looking into every transaction that formed the basis of the client's financial statements, in order not to expose themselves to allegations that they participated in the fraud, if only through inadvertence. This would result in prohibitively expensive audits and not be acceptable to clients, nor consistent with the limited nature of an audit described above. The litigation risk generated by these cases, even when traditional agency and other widely-accepted doctrines ap-

ply, is tremendous. While accountants are frequently viewed as having deep pockets, that is not true, particularly in the case of smaller firms and solo practitioners so many of which provide service in this State. And even the few large firms are at risk. The demise of one of the large accounting firms would have repercussions far beyond the accounting industry.

[H]oldings such as those proposed by the Committee and their *amici*, which seek to create "exceptions" or introduce ambiguity, to well-settled legal doctrines, will exacerbate the litigation explosion. An increase in litigation will result in an increase in liability insurance protection for auditors (if such insurance remains available at all); such costs will be passed on to the clients in the form of increased audit fees.

Moreover, small clients may have trouble finding auditors at all. That is, accountants will be forced to be more selective about the clients they serve, choosing only those with "blue ribbon" risk management and oversight systems, and rejecting those with less sophisticated internal controls to minimize the accountants's litigation risk. Yet these are the clients that are in the greatest need of quality auditors, and the failure to obtain such services may correspondingly [a]ffect those companies' investors, and ultimately the economy.

Brief for *Amici* Accounting Institutes at 17–18 (citations omitted); *accord* Brief of *Amicus* Center for Audit Quality, at 18 ("Because '[t]he threat of disproportionate, catastrophic liability is not necessary to preserve or enhance audit quality,' and such liability would have the perverse effect of reducing the incentive of those charged with the governance of the entity to police or deter fraud, the Committee's proposed departure from the agency and *in pari delicto* doctrines is particularly unwarranted, and unjustifiable." (citation omitted)).

Our review of questions of law certified by the federal courts is plenary. *Salley v. Option One Mortgage Corp.,* 592 Pa. 323, 329, 925 A.2d 115, 118 (2007).

## II.

 As a threshold matter, the parties' arguments traverse some areas beyond the issues expressly certified by the Third Circuit, such as the viability in Pennsylvania of a cause of action for aiding and abetting a breach of fiduciary duty.[14] The Third Circuit also suggested we may wish to address a question which it did not include within its certification request, namely the validity of an innocent-decision-maker exception to imputation. *See AHERF Creditors' Comm. v. PwC*, No. 07–1397, *slip op.*, 2008 WL 3895559, at *4 n. 4

 With respect to all, the resolution of certified issues by this Court is an unusual practice through which, for the sake of comity, we undertake to address legal issues outside the familiar setting of a case over which we maintain conventional jurisdiction. In such a landscape, proceeding beyond the matters we are expressly asked to address raises both jurisdictional and prudential concerns which would immeasurably compound the difficulties already associated with deciding multiple issues within a single case in a Court of seven members. Therefore, it will be our practice to confine ourselves as closely as possible to the certified questions, including in our treatment only subsidiary legal matters fairly subsumed within those certified issues.

### A. *In Pari Delicto*

As noted, we will begin our own substantive discussion with the second of the questions framed by the Third Circuit, which seeks clarification of the *in pari delicto* defense. The Latin derivation and equitable origins of the underlying common-law

---

14. Under present Pennsylvania law as established by the Commonwealth Court as the highest appellate court which has reached the issue, aiding and abetting a breach of fiduciary duty is a recognized cause of action. *See Koken v. Steinberg*, 825 A.2d 723, 732 (Pa.Cmwlth. 2003). The Third Circuit has asked us to consider only whether *in pari delicto* applies in the context of such a claim, *see AHERF Creditors' Comm. v. PwC*, No. 07–1397, *slip op.*, 2008 WL 3895559, at *6 ("Whether it would make sense to allow *in pari delicto* to shield persons alleged to have knowingly aided and abetted this sort of misconduct ... remains an open question."), not the underlying viability of such a claim under Pennsylvania law.

maxim have been well traveled and need not be revisited at length here. *See Hershey v. Weiting*, 50 Pa. 240, 244 (1865) (applying the maxim *"[i]n pari delicto, melior est conditio defenditis"* together with the clean-hands maxim in an equity context). Unlike the cognate clean-hands maxim, however, *in pari delicto* in Pennsylvania, as in many other jurisdictions, has surmounted its moorings in strict equity jurisprudence and transitioned into a defense in actions at law.[15] *See generally* T. Leigh Anenson, *Treating Equity Like Law: A Post–Merger Justification of Unclean Hands*, 45 AM. BUS. L.J. 455, 482–85 (2008) (referencing the *in pari delicto* defense in a broader discussion of the partial merger between law and equity from a viewpoint that the merger represents a positive advancement in the law).[16]

As one Pennsylvania court has noted, *in pari delicto*, as an at-law defense, has been applied principally in situations in which one party seeks to enforce an unlawful contract and where a participant in illegal conduct seeks an accounting for related activity. *See Tarasi v. Pittsburgh Nat'l Bank*, 11 Pa.

15. *See, e.g., Blystone v. Blystone*, 51 Pa. 373, 375 (1865) ("The common law makes that which is fraudulent in fact void; but in all cases of confederate fraud, its maxim is *in pari delicto, potior est conditio defendentis*. Neither party will be aided or relieved against a contract executed by him."); *cf. McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756 (3d Cir.1990) (characterizing the traditional treatment of *in pari delicto* as a common-law defense functioning as a "legal corollary" to the equitable unclean-hands maxim (citing *Rothberg v. Rosenbloom*, 808 F.2d 252, 256 n. 6 (3d Cir.1986))); *Am. Int'l Group, Inc., Consol. Derivative Litig.*, 976 A.2d 872, 882 (Del.Ch.2009) (observing that "Delaware, like most American jurisdictions and our federal common law ... embraces to some extent the venerable in pari delicto doctrine").

16. We bear in mind throughout our discussion that the just application of the broader maxim and its derivatives are integrally dependant on the setting. *See Grede v. McGladrey & Pullen LLP*, No. 08 C 2205, *slip op.*, 2009 WL 3094850 (N.D.Ill. Sep. 29, 2009) ("The Latin maxim, like nearly all of its *fratres*, is a concept, not a rule. Standing alone, it decides nothing and explains little. The usefulness of the maxim depends on the context in which it is invoked").

For this reason, the *Universal Builders* decision has limited application, since, as PwC develops, it involved the application of the unclean hands doctrine in a case brought in equity. As such, it cannot fully answer the question of how *in pari delicto* should function with regard to claims substantively grounded at law.

D. & C.3d 273, 285 (C.P.Allegh.1978).[17] That court also observed, however: "The cases dealing with these situations have made sweeping statements which suggest broader applicability of the doctrine of *in pari delicto*." *Id.* (citations omitted). Certainly, in light of the stance of Pennsylvania courts, including this Court, parties are on ample notice that the judiciary is not tolerant of fraud and illegality, and those who come before it seeking common-law redress relative to matters in which they bear sufficient culpability may suffer disadvantage as a consequence of their own wrongdoing.[18]

While decisions of this Court addressing the *in pari delicto* defense are not plentiful, we find that its development in Pennsylvania has followed the traditional common-law route as cogently described by the Third Circuit in *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756–57 (3d Cir. 1990) (discussing the "traditional construction" of the *in pari delicto* defense in applying New Jersey law); *see also Bateman*, 472 U.S. at 306–07, 105 S.Ct. at 2626–27 (reviewing the "classic formulation" of *in pari delicto* ). In particular, Penn-

17. As PwC develops, *in pari delicto* has also been referenced by courts in the negligence setting, for example, in cases involving personal injury or property damage. In this class of cases at least, however, the comparative negligence and contribution statutes serve to cover much of the ground formerly traveled by reference to the common-law maxim. *See* 42 Pa.C.S. § 7102(a) (prescribing, in such scenarios, "contributory negligence shall not bar a recovery by the plaintiff or his legal representative *where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought,* but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff" (emphasis added)); 42 Pa.C.S. § 8324(a) ("The right of contribution exists among joint-tortfeasors."). Thus, where these statutes are applicable, it is only in unusual cases involving intentional wrongdoing on the part of a plaintiff in which *in pari delicto* may retain relevance.

18. The inquiry takes on another dimension when addressing statutory causes of action, since the specific legislative objectives of the enactment controlling the parties' legal rights must be considered. *See, e.g., Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 138, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968) (rejecting a broadened construction of an *in pari delicto* defense in a private action arising under federal antitrust law); *see also Pinter v. Dahl*, 486 U.S. 622, 632–33, 108 S.Ct. 2063, 2070–71, 100 L.Ed.2d 658 (1988) (elaborating on *Perma Life* in the context of a private action brought under federal securities law).

sylvania requires the plaintiff be an active, voluntary participant in the wrongful conduct or transaction(s) for which it seeks redress, and bear "substantially equal [or greater] responsibility for the underlying illegality" as compared to the defendant. *Id.* (citation omitted).[19] In this Commonwealth, as elsewhere, *in pari delicto* serves the public interest by relieving courts from lending their offices to mediating disputes among wrongdoers, as well as by deterring illegal conduct. *See id.* at 756 (quoting *Bateman,* 472 U.S. at 306, 105 S.Ct. at 2626). *See generally Am. Int'l Group, Inc., Consol. Derivative Litig.* [hereinafter *AIG* ], 976 A.2d 872, 877 (Del.Ch.2009) (explaining that one of the purposes of the "venerable in pari delicto doctrine ... is to prevent courts from having to engage in inefficient and socially unproductive accountings between wrongdoers").

The *AIG* court described some downsides of departing from a traditional and relatively strong approach to the recognition of the *in pari delicto* defense, including:

dampen[ing] the incentive for law compliance by preserving the hope that the costs of an exposed conspiracy might be shifted to the corporation's partners in crime. Such a departure would also require that this court engage in an extremely complex economic and fault-finding inquiry in-

19. *See generally* Amelia Toy Rudolph and Elizabeth Vranicar Tanis, *Invoking In Pari Delicto to Bar Accountant Liability Actions Brought by Trustees and Receivers "Where the Fault Springs, There Let Justice Fall,"* SN073 ALI–ABA 415, 423 (2008) ("Although the precise standard for invoking in pari delicto varies across jurisdictions, courts invariably focus on two aspects of the plaintiff's conduct: (1) the extent of the plaintiff's responsibility for the wrongdoing vis-à-vis the defendant; and (2) the connection between the plaintiff's wrongdoing and the claims asserted.").

Notably, some courts apparently have dispensed with the requirement that the relative degrees of fault, as between the plaintiff and defendant, must be indistinguishable (or the plaintiff's responsibility is clearly greater). *See Bateman,* 472 U.S. at 307, 105 S.Ct. at 2627 (describing this more liberal approach to the defense, albeit refusing to apply it in the context of private actions under federal securities laws). Pennsylvania law, however, has not followed a similar path. *See, e.g., Peyton,* 398 Pa. at 92–93, 156 A.2d at 868–69 (describing the at-least-equal-fault approach, with reliance on *Berman v. Coakley,* 243 Mass. 348, 137 N.E. 667, 668 (1923)).

volving speculation about the extent to which each participant was a net winner or loser as a result of its illegal conduct.

*AIG*, 976 A.2d at 877. We are in full accord with such perspective as it applies to instances in which a corporate plaintiff can be said to be at least equally culpable relative to the subject of its lawsuit.[20]

Nevertheless, the doctrine is subject to appropriate and necessary limits. As the United States Supreme Court has observed, the traditional or classic treatment of *in pari delicto* permits matters of public policy to be taken into consideration in determining the defense's availability in any given set of circumstances. *See Bateman*, 472 U.S. at 307, 310, 105 S.Ct. at 2627–28; *accord AIG*, 976 A.2d at 888 (" 'Unless' is an important word in the in pari delicto context because the doctrine is subject to the exception when another policy is perceived to trump the policy basis for the doctrine itself."). This reflects the roots of the defense in equity jurisprudence and undermines PwC's contention that *in pari delicto* is to be woodenly applied and vindicated in any and all instances in which the culpability of the plaintiff can be said to be at least equal to that of the defendant. *See Peyton*, 398 Pa. at 92, 156 A.2d at 868 (citing 8 P.L.E. § 109).[21] While we are aware of

**20.** Determining the culpability of the corporation, of course, is complicated by the fact that such bodies must act through their agents. Thus, as reflected in the Third Circuit's petition and the parties' arguments, in the *in pari delicto* arena, where corporate plaintiffs are involved, the subject of imputation is a key focus.

**21.** *Accord AIG*, 976 A.2d at 882 n. 21 ("It should be observed that the defense of illegality is allowed from motives of public policy, rather than from a regard for the interests of the objecting party.... The objection comes in appearance from the individual litigant, but in reality from society—the state speaking through the courts." (quoting 3 JOHN NORTON POMEROY, EQUITY JURISPRUDENCE § 940 n. 5 (5th ed. 1941))); *id.* at 883 n. 24 ("Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him." (quoting 2 POMEROY § 941)).

In responding to PwC's counterpoint, we observe that a number of the decisions it references to demonstrate that public policy should not be taken into account actually lend support to the opposing proposition. For example, PwC cites *Graeff*, 64 Pa. at 395, to illustrate that this Court "has faithfully applied *in pari delicto*, 'however ungracious and

the admonition that public policy can be "a very unruly horse," *Feld*, 312 Pa.Super. at 134, 458 A.2d at 550 (quoting *Richardson v. Mellish*, 130 Eng. Rep. 294, 303 (1824)), the recognition of a common-law *in pari delicto* defense is, in the first instance, a refection of the judicial implementation of social policy. *Cf. Graeff*, 64 Pa. at 402 ("The rule [preventing enforcement of prohibited contracts] is one of policy and only to be vindicated on that ground."). We therefore believe the judicious consideration of competing policies which may be implicated in the extension of the defense to novel settings remains within the appropriate purview of our courts. *Accord id.*[22]

In considering the application of *in pari delicto* in the auditor-liability setting, a fast-developing area of the law but apparently one of first impression in this Court, it is useful to put aside, for the moment, all imputation aspects. Were the

abhorrent to our sense of justice such a defence may be' in the particular case." Brief for PwC at 36 (quoting *Graeff*, 64 Pa. at 402); *see also supra* note 9. The relevant passage of *Graeff*, however, is centered on the enforcement of contracts in violation of a statute, and the quoted language concerning the courts' sense of justice is followed by the following admonition: "The rule is one of policy and only to be vindicated on that ground." *Graeff*, 64 Pa. at 402. In any event, the *Graeff* Court found it unnecessary to inquire further concerning the appropriate application of the particular statute involved to the circumstances, since the matter under consideration fell outside the purview of the statute in question. *See id.* Thus, it is important in all of these cases to contextualize the courts' comments before drawing broaderscale conclusions.

**22.** Again, our discussion is centered on the questions posed by the Third Circuit, which arise in the summary-judgment context. For example, we have not been asked to clarify how the broader policy assessment translates into an at-law defense in terms of the relative responsibilities of the court and a jury as fact finder. Here, however, we do take a modest liberty by commenting that similar broader policy-based decisions generally have been allocated to the courts, with juries being charged to make factual determinations and reach specific legal conclusions having a less direct effect in the discernment of overarching social policies. *See, e.g., R.W. v. Manzek*, 585 Pa. 335, 346, 888 A.2d 740, 746 (2005) (explaining, in a negligence context, that "[t]he existence of a duty is a question of law for the court to decide"); *Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 553, 756 A.2d 1166, 1168 (2000) (reflecting that the legal concept of duty of care "is necessarily rooted in often amorphous public policy considerations").

action between a corporation controlled by a single individual and a sole-proprietor auditor, there would be a good case to be made that *in pari delicto* should apply to negate all causes of action arising out of intentional auditor misrepresentations made at the behest of the owner, and thus, with full corporate complicity. At the very least, in the absence of some counter-vailing social policy at stake, the business can be deemed to have exposed itself to a just, judicial determination whether or not to simply leave the equally culpable parties "in the condition in which [they are found]." *Pittsburg v. Goshorn,* 230 Pa. 212, 227, 79 A. 505, 510 (1911); *cf. AIG,* 976 A.2d at 895 ("AIG and its corporate constituencies must live with the consequences of having had a corporate governance structure that permitted managers to enmesh AIG in [false reinsurance and bid-rigging conspiracies].... AIG cannot seek to have this court convene a proceeding whereby ... the court renders a normative and economic judgment about how the spoils and costs of illegal conduct should be shared. The social utility of such a proceeding seems non-existent.").[23]

We appreciate that the debate concerning the availability and strength of *in pari delicto* defenses in the corporate auditing context often encompasses a discussion of the Seventh Circuit's pioneering decision in *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.1982), which favors a very strong application. *See AIG,* 965 A.2d at 826 (summarizing *Cenco* as being "based on the notion that immunizing auditors from malpractice claims, even in situations where the auditor's compliance with professional standards might have helped catch the fraud and limit the harm to the corporation, is good policy because it incentivizes independent directors and even stockholders to be effective monitors of managerial behavior").[24] Like other groundbreaking opinions, *Cenco* subse-

23. The outrageous misconduct asserted on the part of AHERF officers obviously distinguishes this type of case from garden-variety contract and tort claims in which the defense should not be available. To prevent abuses, courts obviously must be judicious in screening cases in which *in pari delicto* is asserted.

24. *Cf.* Dan L. Goldwasser, M. Thomas Arnold, and John H. Eickemeyer, *Accountants' Liability,* PLIREF–ACCT § 4:3.2 (2009) (observing that

quently has been the subject of much thought and discussion. For example, the decision has been criticized as a "free-wheeling opinion" which "[over-]simplifies the complexity" involved in auditor-liability cases. *Id.; see also id.* at 831 n. 245 (questioning "how immunizing the auditors employed to help the independent directors monitor will make either stockholders or independent directors better monitors"). *See generally* Andrew J. Morris, *Some Challenges for Legal Pragmatism*, 28 N. ILL. U.L. Rev. 1, 18–41 (2007) (providing an extensive critique of *Cenco* and its emphasis on relatively loose, pragmatic reasoning). At the very least, *Cenco* must be read in light of the Seventh's Circuit's subsequent decision in *Schacht v. Brown*, 711 F.2d 1343 (7th Cir.1983), which substantially distinguished, qualified, and, at least arguably, limited *Cenco*. *See id.* at 1347–49; *cf. Sunpoint*, 377 B.R. at 566 (presenting the perspective that "[t]he synthesis of [*Cenco* and *Schacht* ] is essentially that the imputation rule should be invoked in auditor liability cases only under circumstances in which its application would serve the objectives of tort liability—to compensate the victims of wrongdoing and to deter future wrongdoing").

We agree with the Seventh Circuit to the extent it has held that *in pari delicto* may be available as a defense in some cases arising in the corporate auditing context, across the broader part of the spectrum of the various common-law causes of action which may be asserted. *See Cenco*, 686 F.2d at 453. Nevertheless, we also find that Pennsylvania law does not accord with *Cenco* in terms of the degree to which the decision, in an auditor-liability context, prioritizes the policy of incentivizing internal corporate monitoring over the objectives of the traditional schemes governing liability in contract and in tort, including fair compensation and deterrence of wrongdo-

"in the context of accountants' liability claims, the *Cenco* defense has become synonymous with the *in pari delicto* defense").

Parenthetically, *Cenco* also has been credited as a heavy influence for the New York peculiarly strong approach to the *in pari delicto* defense a rule of standing. *See AIG*, 965 A.2d at 824 (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir.1991)).

ing.[25]

In this regard, we are cognizant of the special—and crucial—role assumed by independent auditors as a check against potential management abuses. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 817–18, 104 S.Ct. 1495, 1503, 79 L.Ed.2d 826 (1984). Nevertheless, as developed by PwC and its *amici*, there are multiple levels of auditor review, and the specific responsibility of the auditor in any given undertaking generally will depend on the terms of the retention. Such complexities must be taken into account as a factor in a responsible policy-setting decision. The ripple effects of such decisions also merit consideration, including those developed by PwC's *amici*: the growing prevalence of breathtaking malpractice claims against auditors in the corporate insolvency setting; the corresponding litigation burden; and the resultant impact on the profession as a whole, as well as those they serve.[26]

Common-law decision-making is subject to inherent limitations, as it is grounded in records of individual cases and the advocacy by the parties shaped by those records. Unlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion.[27] Here, we have not been

**25.** Thus, to the extent the Third Circuit's *Lafferty* decision incorporates the above aspect of *Cenco* as a prediction of Pennsylvania law, the Third Circuit may now consider it disapproved.

**26.** One commentator recently portrayed the current state of affairs in the profession as follows:

In the wake of almost any kind of adverse financial news, accountants and other persons are commonly sued. Many times the primary wrongdoers in a financial debacle are insolvent, and a lender or investor must look to other parties to recoup losses. Frequently accountants are among the primary targets. The recent environment after Enron, Worldcom and other well-publicized financial scandals, is a difficult one for accountants, as the profession has cost itself credibility and jurors are often hostile as a result.

Richard P. Swanson, *Accountants' Liability, Theories of Liability*, SN073 ALI–ABA 23, 26 (ALI 2008).

**27.** The broader tools available to the legislative branch in making social policy judgments, including the availability of comprehensive investiga-

presented with sufficient information concerning all relevant factors to lend our support to any general rule which would uniquely disable auditors, as a class, from asserting an *in pari delicto* defense.

## B. Imputation

As reflected above, at least in the absence of evidence of volitional wrongdoing on the part of AHERF's board of trustees, attribution of the officers' misdoings to AHERF is a linchpin to PwC's assertion of an *in pari delicto* defense. Thus, as is often the case, agency law plays a pivotal role in the defense's practical availability.

This brings us to the question initially raised in the Third Circuit's certification petition: whether such knowledge of the alleged fraud and complicity as was held by AHERF officers should be imputed to the corporation, thereby exposing it to an application of the *in pari delicto* doctrine and/or other defenses which might arise, in the first instance, against an active wrongdoer proceeding volitionally.

As amply developed in the parties' arguments, the imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority. *See Todd,* 384 Pa. at 428–29, 120 A.2d at 909–10; *Gordon,* 319 Pa. at 565, 181 A. at 577–78; *accord AIG,* 976 A.2d at 886–87 ("Having invested its employees with the authority necessary to engage in the illegal actions at issue, AIG is responsible for those employees' (mis)use of that power."). This is, in part, because it is the principal who has selected and delegated responsibility to those agents; accordingly, the doctrine creates incentives for the principal to do so carefully and responsibly.[28] Imputation also serves to protect

tions, are discussed in *Pegram v. Herdrich,* 530 U.S. 211, 221–22, 120 S.Ct. 2143, 2150, 147 L.Ed.2d 164 (2000).

**28.** *Aiello,* 508 Pa. at 559, 499 A.2d at 285–86; *accord* Restatement (Third) of Agency § 5.03 cmt. b (2006) ("Imputation creates incentives for a principal to choose agents carefully and to use care in delegating functions to them."); *cf. Byrne v. Dennis,* 303 Pa. 72, 76, 154 A. 123, 125 (1931) (explaining that imputation "is founded on the duty of the

those who transact business with a corporation through its agents believing the agent's conduct is with the authority of his principal. *See id.* at 553, 559, 499 A.2d at 285.

The first exception highlighted by the parties is that involving adverse interest—where an agent acts in his own interest, and to the corporation's detriment, imputation generally will not apply. *See Todd,* 384 Pa. at 429, 120 A.2d at 909.[29] The primary controversy surrounding the appropriate application of the adverse-interest exception here concerns the degree of self-interest required, or, conversely, the quantum of benefit to the corporation necessary to avoid the exception's application (where self-interest is evident).

As PwC highlights, the *Todd* decision, by its terms, does lend some support to its position that any benefit will do. *See Todd,* 384 Pa. at 429, 120 A.2d at 909. Nevertheless, the Court, in *Todd,* ultimately did not apply imputation against the principal in the case. *See id.* at 429–30, 120 A.2d at 909–10. Since the agent's wrongful acts were found to have been outside the scope of his authority, *see id.,* the degree of benefit necessary to support imputation was not sharply in focus in the opinion.

Moreover, we agree with the district court that it would be illogical to apply too broad a test for self-interest. *See AH-ERF Creditors' Comm. v. PwC,* No. 2:00cv684, *slip op.* at 21 (reasoning that such a standard recognizing the mere fact of an officer's compensation as sufficient to demonstrate self-interest "would discharge corporations from liability for the misdeeds of its officers or directors in almost every instance"). For example, in circumstances involving colluding corporate entities engaged in false reinsurance and bid-rigging conspiracies (but, significantly, outside the corporate auditing context), the *AIG* court made an extensive case for strong imputation

agent to communicate all material information to his principal, and the assumption that he has done so.").

**29.** *See generally In re National Century Fin. Enters., Inc., Inv. Litig.,* 604 F.Supp.2d 1128, 1143 (S.D.Ohio 2009) (recognizing that adverse interest is "widely acknowledged" as an exception to the general rule of imputation).

rules, including a low threshold for benefit, supporting a potent form of *in pari delicto* defense. *See AIG*, 976 A.2d at 889. Its concern was that weakening the defense and associated rules of imputation would represent an inappropriate reallocation of risks, as well as eviscerate socially useful defenses which otherwise would be available to those who transact with corporations.[30]

On the other hand, we believe there is also as much difficulty with applying too liberal a litmus for benefit, particularly in a paradigm involving alleged collusion between the agent and the defendant. *Cf. Adelphia*, 365 B.R. at 56 ("This Court is not of a mind to hold at this point in time, on motion, that even a peppercorn of benefit to a corporation from the wrongful conduct would provide total dispensation to defendants knowingly and substantially assisting insider misconduct that is overwhelmingly adverse to the corporation.").

In light of the competing concerns, the appropriate approach to benefit and self-interest is best related back to the

**30.** The following passage from the *AIG* opinion offers further insight into the development of the court's reasoning:

[T]he plaintiffs argue that stockholders should be able to seek recovery on behalf of their corporations when faithless fiduciaries had some personal interest, or when there was a group of innocent insiders who might have been able to thwart the illegal activities. According to the plaintiffs, in such situations the traditional rule [of *in pari delicto*] is unjust because the stockholders themselves did not act wrongfully, and therefore the traditional in pari delicto rules should be set aside so that the corporation can be made whole and thus the economic interests of the innocent stockholders can be protected.

But, the exceptions that the plaintiffs request would eviscerate the in pari delicto doctrine and contravene the policy judgments upon which that doctrine rests. Although one can sympathize with stockholders who lost money due to investments in a company that engaged in illegal activity, public policy is not served by allowing corporations to sue their own co-conspirators. Stockholders like the plaintiffs already have the benefit of one very large exception to the doctrine: the ability to sue corporate insiders on behalf of the company.... [C]ontrary to the plaintiffs' assertions, allowing stockholders to expand this exception ... would not be socially useful. Rather, it would force courts to engage in inefficient accounting inquiries between wrongdoers while diminishing corporate boards' incentives to supervise their own agents.

*AIG*, 976 A.2d at 889.

underlying purpose of imputation, which is fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations. *See generally In re Subpoena on Judicial Inquiry and Review Bd.*, 512 Pa. 496, 504, 517 A.2d 949, 953 (1986) (observing that, where the Court is presented with a rule of law developed in the courts, "we would of course be acting in the best spirit of the common law tradition in testing the rule against its reason."). In this regard, we draw a sharp distinction between those who deal in good faith with the principal-corporation in material matters and those who do not.

As to the former category, those who proceed in good faith, including those who may bear a degree of culpability (such as instances in which an auditor's malpractice is limited to negligence), we find that the parties' respective arguments raise very difficult questions. *See AIG*, 976 A.2d at 890 n. 49 (recognizing that the negligent-auditor scenario "is a matter upon which reasonable minds can differ"). While we read the rationale for the New Jersey Supreme Court's decision in *NCP* as effectively negating imputation (and thus barring the *in pari delicto* defense) relative to comparable claims of negligence against auditors, *see NCP*, 901 A.2d at 888, 890, we previously have noted our concern regarding the complexity of doctrine-setting social-policy judgments in this arena.

■■ On balance, we believe the best course is for Pennsylvania common law to continue to recognize the availability of the *in pari delicto* defense (upon appropriate and sufficient pleadings and proffers), via the necessary imputation, in the negligent-auditor context. This gives appropriate recognition to the fact that it is the principal who has empowered the agent and dovetails with other defenses which may be available to a negligent auditor under prevailing Pennsylvania law, in particular, those related to audit interference. *See Jewelcor Jewelers and Distributors, Inc. v. Corr*, 373 Pa.Super. 536, 550–53, 542 A.2d 72, 79–80 (1988) (citing *National Surety Corp. v. Lybrand*, 256 A.D. 226, 9 N.Y.S.2d 554 (N.Y.App.Div. 1939)). In this regard, we agree with PwC and its *amici* that the involvement of AHERF's officers in the course of affairs

surrounding the company's demise, in the form of their assert-
ed outrageous misconduct, should have a legitimate place in
the negligence case against PwC to the degree C & L can be
said to have acted with material good faith.[31]

In terms of other important policy concerns, we do not
believe it undermines the objectives of our tort and contract
schemes to deny recovery to one whose agents have acted for
the benefit of the corporation with culpability exceeding that
of the defendant. *Cf.* 42 Pa.C.S. § 7102(a) (recognizing the
availability of recovery on a comparative negligence basis in
personal-injury and property-damage cases, where the plain-
tiff's own negligence "was not greater than the causal negli-
gence of the defendant"). Similarly, we conclude that the
traditional, liberal test for corporate benefit should apply in
such scenarios. *See supra* note 12.

The Third Circuit's certification petition, however, also rais-
es the issue of auditor collusion, and we take a much different
view of fraudulent activity. In this regard, the ordinary
rationale supporting imputation breaks down completely in
scenarios involving secretive, collusive conduct between corpo-
rate agents and third parties. *Cf. AIG,* 965 A.2d at 807
("Delaware law provides no safe harbor to high-level fiducia-
ries who group together to defraud the board.").[32] This is so

31. Indeed, under prevailing Pennsylvania law as presently established
by the Superior Court, contributory negligence in the accounting con-
text (as contemplated by *Jewelcor,* 373 Pa.Super. at 550–52, 542 A.2d at
79–80), continues to function as a complete bar to recovery under
negligence theory, *see Gorski v. Smith,* 812 A.2d 683, 702 (Pa.Su-
per.2002). This stands in stark contrast with the more flexible compar-
ative negligence regime established by the Legislature to govern claims
involving personal injury or property damage. *See supra* note 17.
Permitting the use of imputation to support an *in pari delicto* defense in
the negligent-auditor scenario relative to those who have proceeded in
good faith, by way of comparison, represents a relatively modest allow-
ance, particularly given the supporting requirement of at least equal
fault.

32. *Accord NCP,* 901 A.2d at 882 (explaining that the imputation doc-
trine exists to protect third parties from being sued by corporations
whose agents have engaged in malfeasant behavior against those third
parties, but, "[w]hen the agent is in collusion with a third person to
defraud the principal, the latter will not be responsible for the knowl-

because imputation rules justly operate to protect third parties on account of their reliance on an agent's actual or apparent authority. *See Castegnaro*, 565 Pa. at 252–53, 772 A.2d at 460. Accordingly, such principles do not (and should not) apply in circumstances in which the agent's authority is neither actual nor apparent, as where both the agent and the third party know very well that the agent's conduct goes unsanctioned by one or more of the tiers of corporate governance.[33]

AHERF's officers had no actual or apparent authority to misrepresent corporate finances or collude with C & L agents to secure false audit reporting, as alleged in the Committee's complaint. To the extent this occurred with the auditors' knowledge and acquiescence, as the Committee avers, applying imputation as against AHERF would result in the corporation being charged with knowledge as against a third party whose agents actively and intentionally prevented those in AHERF's governing structure who were non-participants in the fraud from acquiring such knowledge. Such an application of the imputation doctrine seems ill-advised, if not perverse.[34]

edge of the agent in relation to such fraud" (quoting *Hickman v. Green*, 123 Mo. 165, 27 S.W. 440, 443 (1894))).

As noted, we have departed from the *NCP* court's approach in the negligent-auditor scenario. We observe, however, that we are in full agreement with its rationale as pertaining to collusive ones. Indeed, although there was a sharp divide among New Jersey Justices in the *NCP* case concerning imputation relative to a *negligent* auditor asserting *in pari delicto*, all were of a mind that *in pari delicto* was unavailable to a *collusive* one. *See NCP*, 901 A.2d at 881–82; *id.* at 891 (LaVecchia, J., dissenting) ("We allow a carve-out from [imputation] for suits against third parties who were active participants in the fraud."); *id.* at 896 (Rivera–Soto, dissenting) ("[T]he reach of the imputation defense is not without bounds: the party invoking the imputation defense cannot be complicit in the fraud perpetrated.").

33. *See generally* Restatement (Third) of Agency §§ 2.01 (explaining that an agent acts with actual authority when the agent reasonably believes the principal wishes the agent so to act), 2.02 (defining apparent authority as the power held by an agent to affect a principal's legal relations with a third party "when a third party reasonably believes the action has authority....").

34. We have previously noted that portions of PwC's brief blend the negligent- and collusive-auditor scenarios. In response to PwC's contentions, we observe that many of the decisions it references to support

As noted, the justification for imputation has also been stated in terms of the recognition that it is the principal which has empowered the agent; accordingly, the principal rightly bears the risk of agent malfeasance. This rationale, however, also does not support imputation in the collusive-auditor scenario. The underlying assumption that an agent will communicate all material information to his principal, *see Byrne*, 303 Pa. at 76, 154 A. at 125, does not logically pertain to instances in which there is collusion to withhold information from corporate governance.[35]

This confluence of agency-law principles demonstrates that, fundamentally, imputation is not justified in scenarios involving secretive, collusive activity on the part of an auditor to misstate (and/or sanction management's misstatement of) corporate financial information. *Cf. Corn*, 401 Pa. at 544, 165 A.2d at 616 ("[W]hen a party to a transaction acts in collusion

a broad imputation rule do not readily extend to situations entailing collusion. For example, in one decision prominently cited by PwC, *Gordon*, 319 Pa. at 555, 181 A. at 574, the defendant was an insurance company which had been defrauded by an agent of a corporate insured (a trust company). There was no indication of collusion on the part of the insurance company or its agents in the fraud. Moreover, *Gordon* repeatedly highlighted the aim, of imputation, to protect those lacking knowledge of the agent's misdeeds. *See, e.g., id.* at 562, 181 A. at 576 ("Liability [of the principal] is based upon the fact that the agent's position facilitates the consummation of the fraud, in that, from the point of view of the third person, the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." (citation omitted)).

**35.** Along these lines, this Court has explained:

The rule that knowledge or notice on the part of the agent is to be treated as notice to the principal is founded on the duty of the agent to communicate all material information to his principal, and the presumption that he has done so. But the legal presumptions ought to be logical inferences from the natural and usual conduct of men under the circumstances. But no agent who is acting in his own antagonistic interest, or who is about to commit a fraud by which his principal will be affected, does in fact inform the latter, and any conclusion drawn from a presumption that he has done so is contrary to all experience of human nature.

*National Bank of Shamokin v. Waynesboro Knitting Co.*, 314 Pa. 365, 371, 172 A. 131, 134 (1934) (quoting *Gunster v. Scranton Illuminating Heat & Power Co.*, 181 Pa. 327, 337–338, 37 A. 550, 552 (1897)). We differ with PwC's suggestion that the adverse-interest exception and associated benefit assessment function independently from such logic.

with an officer of a bank, or knows or should know that the officer is acting beyond his authority and contrary to the best interests of the bank, the knowledge of the bank officer in such regard cannot be imputed to the bank."). In fact, as noted, both parties accept this general conclusion (in principle at least) by recognizing a "collusion" exception to imputation.

PwC nonetheless seeks to limit the breadth of this exception. Principally, it maintains that it applies only in "circumstances in which the agent and the third party conspire to commit a fraud *against* the principal." Brief for PwC at 26. Thus, PwC's argument circles back to its perspective that the alleged, secretive falsification of corporate financial information by rogue officers can be regarded as a benefit to the corporation—even where the defendant-auditor knows the information is false—and any amount of benefit will do to permit imputation.

In close cases, adverse interest and the associated inquiry into benefit may be questions steeped in fact and open to legitimate differences among reasonable minds. *Cf. NCP,* 901 A.2d at 878 ("Deciding whether to permit an auditor to utilize imputation requires a detailed factual analysis of the dispute." (quoting Maureen Mulligan *et al., Recent Developments in the Law Affecting Professionals, Officers, and Directors,* 36 TORT & INS. L.J. 519, 535 (2001))). Nevertheless, in the collusion scenario—as a matter of law—we regard it to be in the best interests of a corporation for the governing structure to have accurate (or at the very least honest) financial information. Thus, like other courts, in settings involving auditors who have not proceeded in material good faith relative to a principal-corporation, we decline to consider a knowing, secretive, fraudulent misstatement of corporate financial information to be of benefit to a company.

In terms of the parties' differences regarding whether benefit should be assessed according to the subjective intent of the agent, we believe it is most consistent with agency principles to evaluate benefit in light of the reasonable perspective of a third party in its dealings with the agent. *Accord Gordon,* 319 Pa. at 562, 181 A. at 576. That is, the question

generally should be whether there is sufficient lack of benefit (or apparent adversity) such that it is fair to charge the third party with notice that the agent is not acting with the principal's authority. Notably, such approach dovetails with the core concept of apparent authority in the first instance. *See supra* note 33.

Along such lines, the Third Restatement includes a caveat that imputation does not protect "those who know or have reason to know that an agent is not likely to transmit material information to the principal." Restatement (Third) of Agency § 5.04, cmt. b. The following elaboration is also provided:

It is helpful to view questions about imputation from the perspective of risk assumption, taking into account the posture of the third party whose legal relations with the principal are at issue. A principal assumes the risk that the agents it chooses to interact on its behalf with third parties will, when actual or apparent authority is present, bind the principal to the legal consequences of their actions. This is because the principal chooses its agents, has the right to control them, and determines how to characterize its agents' positions and indicia of authority in manifestations made to third parties. A principal's incentive systems and other practices may also have the effect of discouraging agents from reporting information that, after the fact, it would have been advantageous for the principal to have known.

In contrast, when the third party whose legal relations with the principal are at issue has not dealt with the principal (either directly or through an agent) or has not dealt in good faith, the principal does not bear the risk that its agent may withhold relevant information to serve the agent's own purposes or those of another person. A principal should not be held to assume the risk that an agent may act wrongfully in dealing with a third party who colludes with the agent in an action that is adverse to the principal. That is, the third party should not benefit from imputing the agent's knowledge to the principal when the third party has acted wrongfully or otherwise in bad faith. The circumstances surrounding a transaction, including the magnitude of benefit it

will confer on the agent who arranges it, may place a reasonable third party on notice that the agent will withhold material information from the principal.

Restatement (Third) of Agency § 5.04, cmt. c (citation omitted). Our decision here is in full accord with the Restatement approach in these material respects.

Thus, on the factual circumstances detailed in the Third Circuit's certification petition, entailing secretive, collusive conduct of agent and auditor, Pennsylvania law renders imputation unavailable, as the auditor has not proceeded in material good faith.[36]

Finally, in the course of PwC's arguments, it highlights that the Committee also employs imputation principles against it by attributing to PwC the conduct of C & L's agents who are alleged to have assisted AHERF officers in the fraud. Our only comment is that, in scenarios involving mutual fault of agents engaging in unauthorized conduct on both sides of a transaction, to some extent both the audit firm and the corporation may be regarded as victims.[37] Sorting through the respective rights and obligations of the litigants in such scenarios is, by its nature, difficult and complex (which, not by pure coincidence, serves as one of the reasons supporting the extension of *in pari delicto* in such settings where there is also mutual fault). Here, we can say only that it is outside the scope of these certification proceedings to address the vicarious aspect of any liability borne by PwC or other lines of defense it may be asserting in the federal proceedings.

### III.

In summary, and for the above reasons, we respond to the Third Circuit's certification petition as follows:

36. Whether the Committee's proffers in this regard are sufficient to surmount PwC's pending summary-judgment challenge is a matter beyond the scope of this opinion. Again, we recognize that PwC denies the averments of wrongful conduct on the part of C & L and its agents.

37. Of course, there may be independent grounds (other than mere imputation) for liability on the part of the principals on either side of the transaction, such as when there is proven negligence or acquiescence at the supervisory level; and, in such circumstances, a principal may be regarded in different stead.

1. The proper test to determine the availability of defensive imputation in scenarios involving non-innocents depends on whether or not the defendant dealt with the principal in good faith. While one of the primary justifications for imputation lies in the protection of innocents, in Pennsylvania, it may extend to scenarios involving auditor negligence, subject to an adverse-interest exception, as well as other limits arising out of the underlying justifications supporting imputation. Imputation does not apply, however, where the defendant materially has not dealt in good faith with the principal.

2. The *in pari delicto* defense may be available in its classic form in the auditor-liability setting, subject to ordinary requirements of pleading and proof (including special ones related to averments of fraud where relevant), and consideration of competing policy concerns. However, as noted, imputation is unavailable relative to an auditor which has not dealt materially in good faith with the client-principal. This effectively forecloses an *in pari delicto* defense for scenarios involving secretive collusion between officers and auditors to misstate corporate finances to the corporation's ultimate detriment.

Having thus answered the certified questions, we return the matter to the Third Circuit.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.